**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David LOYD, Mark Soukenik, William Hood, Jake Loyd, Robert C. Kilpatrick, and Sidney Bedgood, Defendants-Appellants.**

**No. 82–6093.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 16, 1984.

Neil H. Jaffee, Fort Lauderdale, Fla., for D. Loyd.

John Lazarus, Miami, Fla., for Soukenik.

Denis Dean, Dean & Hartman, P.A., Miami, Fla., for Hood.

Gersten & Vitale, Anthony Vitale, Miami, Fla., for J. Loyd.

Laurel White, Marc-Charles, Fort Lauderdale, Fla., for Kilpatrick.

Scott Jay, Miami Beach, Fla. (Court-appointed), for Bedgood.

Richard K. Harris, Asst. U.S. Atty., Stanley Marcus, U.S. Atty., Linda C. Hertz, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee USA.

Before GODBOLD, Chief Judge, TJO-FLAT and HENDERSON, Circuit Judges.

GODBOLD, Chief Judge:

In this appeal we review the convictions of the six appellants on various drug charges. We find that two of the defendants were improperly subjected to double jeopardy on one count and reverse their convictions on that count. We also conclude that the district court followed an incorrect rule of law in evaluating material claimed to come within the Jencks Act, 18 U.S.C. § 3500 (1976), and remand for further consideration under the appropriate legal standard. We reject all other contentions by the appellants.

## I. Facts and procedural history

Simpkin, Lyons, and Zeigler ran an extensive marijuana smuggling ring with boats going to the Bahamas, picking up marijuana from a shuttle or "mother" boat, and returning to Southern Florida where crew members would off-load the marijuana into stash houses located behind private residences. While this smuggling ring engaged in a number of operations, only the four relevant to this appeal will be detailed. The facts are largely derived from the testimony of three co-conspirators who became government witnesses, Merrill, Archie Arnold (Archie), and Joe Arnold (Joe).

Around May 1, 1979, Merrill and Thone, two members of the conspiracy, used the NINA NU to pick up approximately 3500 pounds of marijuana in the Bimini islands. The boat returned to Florida and docked behind a house at Rivo Alto. Merrill left the house but Thone remained. Also present at the house were Simpkin, Zeigler, and Hood. The police came on the scene and arrested Thone, Zeigler, and Hood. Simpkin escaped by swimming away.[1]

Approximately a year later, in May 1980, Merrill and Archie went to Honeymoon Harbor in the Bahamas on a boat supplied with fuel and provisions by either David Loyd (David) or Jake Loyd (Jake). At Honeymoon Harbor Merrill and Archie met several other boats, including the JEZEBEL with David aboard and the YELLOWBIRD with Soukenik on board. The boats met a freighter loaded with marijuana, which was transferred to the smaller boats. Archie's boat received 15–20 marijuana bales; the other boats also received marijuana, although the amount is uncertain. After the boats returned to Florida, Archie and Jake went to Zeigler's house to be paid.[2]

In September 1980 Archie attended a briefing session at Simpkin's warehouse, after which he and Jake rode a boat to Gun Cay. There they joined other boats, including the YELLOWBIRD with Soukenik aboard and the XAVIER with Roth on board. The boats met a shuttle boat from which they received marijuana. Archie's boat took on 15–20 bales of marijuana; the other boats received an undetermined amount of marijuana.

After the boats returned to Florida, the XAVIER was offloaded. Archie, Soukenik, and David helped to offload 100 to 125 bales of marijuana. After the offload, Zeigler took Archie, David, and Jake to Archie's car.[3]

Approximately one month later, in October 1980, Archie went to another briefing session at Simpkin's warehouse which Soukenik and Bedgood also attended. After the briefing, Archie and David went to Gun Cay on a scarab boat. There they met several boats with co-conspirators aboard, the EXCALIBER with Jake, the JEZEBEL with Kilpatrick and Joe, the USA # 1 with Soukenik, and the BOTH BRASS with Bedgood. The boats received marijuana from a shuttle boat and returned to Florida separately.

When Archie and David returned to the marina, they left their boat and joined Jake

---

1. This episode formed the basis for Count VIII and will be referred to as the Rivo Alto incident.

2. This trip formed the basis for Counts XI and XII and will be referred to as the Honeymoon Harbor trip.

3. This occurrence formed the basis for Counts XIII and XIV and will be referred to as the XAVIER offload.

and Hood on the DOCK'S BABY. The boat then went out to meet the JEZEBEL, which was being followed by a Customs boat. When the DOCK'S BABY diverted the Customs boat, Kilpatrick ran the JEZEBEL aground and he and Joe escaped. Customs agents subsequent found 7000 pounds of marijuana on the JEZEBEL.[4]

Based on the testimony of Merrill, Archie, Joe and others, the grand jury indicted 24 people for various violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 et seq. (1976). Prior to trial Simpkin, Lyons, Thone, Roth, and two other indictees pled guilty. At the time of trial Zeigler remained at large. Consequently only 17 defendants went to trial. The jury acquitted seven defendants and was unable to reach a verdict as to three. It convicted David, Jake, Hood, Bedgood, Soukenik, and Kilpatrick of conspiracy to import marijuana (Count IV) and conspiracy to possess marijuana with intent to distribute (Count V). It also convicted all six of importation of marijuana and possession of marijuana with intent to distribute, although on different counts. A seventh defendant, not a party to this appeal, was also convicted. The six appealed their convictions.

Appellants raise numerous claims: (1) whether there was sufficient evidence to convict David of Counts XI and XII (the Honeymoon Harbor trip), Soukenik of Counts XI and XII (the Honeymoon Harbor trip) and XIII (XAVIER offload), Bedgood of Counts IV and V (conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute) and XXI and XXII (the JEZEBEL run), and Hood of Counts IV and V (conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute), Count VIII (the Rivo Alto incident), and XXI and XXII (the JEZEBEL run); (2) whether David was improperly placed in double jeopardy on Counts IV and V (conspiracy to import marijuana and conspiracy to possess mari-

juana with intent to distribute) and whether David and Hood were improperly placed in double jeopardy on Count V (conspiracy to possess marijuana with intent to distribute; (3) whether the district court abused its discretion in not granting Bedgood a severance; (4) whether the district court abused its discretion in lifting the sequestration rule as to Joe so that the government could interview him in the middle of his testimony; (5) whether the district court abused its discretion in admitting into evidence a statement by a declarant that implicated Joe in the marijuana conspiracy; (6) whether the district court committed error in the procedure it followed to determine whether material came within the Jencks Act, 18 U.S.C. § 3500 (1976); and (7) whether the district court abused its discretion in allowing the direct, cross, and redirect examination of three government witnesses to be read to the jury during its deliberations.

## II. Sufficiency of the evidence

We reject all the claims of insufficient evidence.

On appeal the evidence and all reasonable inferences must be viewed in the light most favorable to the government. *See Glasser v. U.S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Furthermore, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *U.S. v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (Unit B) (en banc) (footnote omitted), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

To prove a drug conspiracy the government must show, by direct or circumstantial evidence, an agreement by two or more persons to violate federal narcotics

---

**4.** This incident formed the basis for Counts XXI and XXII and will be referred to as the JEZE- BEL run.

laws. *U.S. v. Badolato*, 701 F.2d 915, 919–20 (11th Cir.1983).

> [T]he Government must demonstrate ... that a conspiracy existed, that the defendant had knowledge of it, and that he or she voluntarily became part of it.... Moreover, the requirement of knowledge of the conspiracy agreement refers simply to knowledge of the essential objective of the conspiracy.... To be found guilty, a defendant need not have knowledge of all the details of the conspiracy, and may play only a minor role in the total operation....

*Id.* at 920 (citations omitted).

■ David challenges the sufficiency of evidence on Counts XI and XII, importation of marijuana and possession of marijuana with intent to distribute. These counts concern the Honeymoon Harbor trip. David does not challenge his conviction on the conspiracy counts. Consequently, he is liable for any act done by a co-conspirator in furtherance of the conspiracy. *Pinkerton v. U.S.*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946); *see also U.S. v. Raffone*, 693 F.2d 1343, 1346 (11th Cir.1982).

Archie testified that either David or Jake supplied the provisions for the Honeymoon Harbor trip. 9 Rec. at 409. He also stated that when his boat arrived at Honeymoon Harbor, he saw several other boats, including the JEZEBEL with David aboard. *Id.* at 417. Archie's boat received approximately 15–20 bales of marijuana; he saw the other boats being loaded, but was uncertain how much marijuana they received. *Id.* at 419. Archie testified that the boats left at 30-minute intervals to return to Florida. *Id.* at 423.

■ Archie's trip to Honeymoon Harbor and back provided sufficient evidence against David, a co-conspirator, on these two counts. Furthermore, from Archie's testimony the jury could reasonably infer that David's boat received marijuana and returned to Florida with it.

Soukenik contests the sufficiency of evidence against him on the Honeymoon Har-

bor trip counts as well as the sufficiency of evidence on the XAVIER offload importation charge, Count XIII. Because Soukenik does not challenge his conviction on the conspiracy counts, he is liable for any act done by a co-conspirator in furtherance of the conspiracy. *Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. at 1184.

Archie testified that when he arrived in Honeymoon Harbor, Soukenik was there aboard the YELLOWBIRD. 9 Rec. at 417. As with David, Archie's testimony about the other boats receiving marijuana and returning to Florida in 30-minute intervals provided sufficient evidence for the jury to infer that the YELLOWBIRD received marijuana and took it back to Florida. Furthermore, as a member of the conspiracy, Soukenik is liable for Archie's importation and possession of marijuana.

For the XAVIER offload, Soukenik challenges his conviction on the importation charge but not on the possession with intent to distribute charge. The evidence on this incident was similar to the evidence on the Honeymoon Harbor trip: Archie saw the other boats loaded with marijuana but did not know the quantity. *See id.* at 435. One of the boats Archie saw at Gun Cay was the YELLOWBIRD with Soukenik on board. *Id.* at 434. As explained above, the evidence is sufficient for the jury reasonably to infer that the YELLOWBIRD returned to Florida with marijuana. Additionally, Soukenik would be liable as a co-conspirator for Archie's act of importing marijuana.

■ Bedgood challenges both his convictions for conspiracy and his convictions for importation and possession of marijuana. As noted above, one may be liable as a conspirator even if he plays only a minor role in the scheme. Archie testified that Bedgood attended a briefing session at Simpkin's warehouse and then appeared at Gun Cay on the BOTH BRASS with Lyons, a leader of the smuggling ring. *Id.* at 449, 453. The BOTH BRASS was used to find the shuttle boat carrying the marijuana. This evidence was sufficient for a reasonable jury to infer that Bedgood had knowl-

edge of the conspirators' intent to import marijuana into the U.S. and then possess it with intent to distribute it. Despite Bedgood's apparently small role in the operation, there was no error in his conviction on either the conspiracy or the substantive counts.

Finally, Hood challenges his conviction on the conspiracy counts, the Rivo Alto incident and the JEZEBEL run. Merrill, Archie, and Joe all testified to Hood's involvement in the conspiracy. Merrill stated that Hood was first mate on several occasions and helped load Merrill's boat with marijuana a couple of times. 8 Rec. at 131. Archie testified that the DOCK'S BABY, with Hood aboard, was used as a "blocker boat" for the JEZEBEL when it was being followed by a Customs boat. 9 Rec. at 457–61. Joe testified that Hood was aboard the DOCK'S BABY when it acted as a blocker boat, 11 Rec. at 857–61, and that on one occasion he saw Hood waiting to go on a smuggling trip and later that day helped Hood load his boat with marijuana. 10 Rec. at 759. Finally, Merrill testified he was informed that after he left the NINA NU at the Rivo Alto house, several people were arrested, including Hood. 8 Rec. at 139–40.

■ This evidence is sufficient to support Hood's conviction on the conspiracy counts. Furthermore, given Hood's membership in the conspiracy, it would be reasonable for a jury to infer that he was not an innocent passenger on the DOCK'S BABY when it was used as a blocker boat for the JEZEBEL. Additionally, Hood as a co-conspirator would be liable for importation of marijuana by Kilpatrick and Joe on this occasion. Finally, as to the Rivo Alto incident, Merrill's testimony established that he and Thone had brought 3500 pounds of marijuana from the Bimini islands to Florida. As a co-conspirator, Hood would be liable for this importation. Furthermore, given Hood's knowledge of the purpose of the conspiracy, a reasonable jury could infer that he was at the house in Rivo Alto to help further the conspiracy.

## III. Double jeopardy

■ David asserts that Counts IV and V constitute double jeopardy because they both involve the same people, time frame, locations, and overt acts. A defendant may, however, properly be convicted of both conspiracy to import and conspiracy to possess with intent to distribute without violating the double jeopardy clause. *U.S. v. Rodriguez*, 612 F.2d 906, 920–25 (5th Cir.1980) (en banc), *aff'd sub nom Albernaz v. U.S.*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

David and Hood also claim that they were subjected to double jeopardy on Count V because they had previously been tried and convicted for an overlapping conspiracy to possess marijuana with intent to distribute. *Blockburger v. U.S.*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), generally provides the test for determining whether two offenses are the same. However, the *Blockburger* test is not sufficient when there is a claim of double jeopardy on two conspiracy charges, because a prosecutor could divide a single conspiracy into two separate charges by alleging different overt acts for the two conspiracies when in fact only one conspiracy existed. *U.S. v. Ruigomez*, 576 F.2d 1149, 1151 (5th Cir. 1978). The Fifth Circuit identified the factors to consider in determining whether the conspiracy involved in the prior case is the same as the conspiracy for which the defendant is now on trial.

> Our examination of the record focuses upon these elements: (1) time, (2) persons acting as coconspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

*U.S. v. Marable*, 578 F.2d 151, 154 (5th Cir.1978).

■ The defendant must come forward with a prima facie nonfrivolous claim of

double jeopardy. *U.S. v. Stricklin,* 591 F.2d 1112, 1117–18 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). Once the defendant has met this requirement, the government must establish by a preponderance of the evidence that the indictments charge separate crimes. *Id.* at 1118–19.

The defendants showed that the previous indictment involved a conspiracy that terminated around August 4, 1981 in Delray Beach, Florida, 5 Rec. at 596; the present indictment charges a conspiracy beginning some unknown time prior to June 1977 and continuing until February 1982, 1 Rec. at 6, 21. The present indictment charges a conspiracy in Dade, Broward, and Palm Beach Counties; the prior indictment charged a conspiracy in Palm Beach County. The earlier indictment charged David, Hood, Hume, and a fourth person. The present indictment charged 24 persons, including David, Hood, and Hume. In the first indictment, Hood was charged under an alias while in this indictment he was charged under his true name; Hume was charged in the first indictment under his real name and in this indictment under an alias. The prior indictment charged conspiracy to possess with intent to distribute and possession with intent to distribute; this indictment charges conspiracy to import, conspiracy to possess with intent to distribute, importation, and possession with intent to distribute. Although the first indictment charged no overt acts, the incident that formed the basis for the indictment occurred at Hume's house around August 4, 1981; the overt acts charged in this indictment range from June/July 1977 to October 1981.

 Additional evidence suggesting that the two conspiracies are the same is

the testimony of Willis, a government witness in this case, to the grand jury that Hume's house was used in the conspiracy presently charged. 5 Rec. at 600.[5]

Given the evidence presented by the defendants, we conclude that they presented a prima facie nonfrivolous case of double jeopardy. It was therefore incumbent upon the government to introduce evidence that in fact the two indictments charged separate conspiracies. The government introduced no evidence on this point. Furthermore, the trial record in this case does not affirmatively show a different conspiracy than the one charged in the first indictment. *Cf. U.S. v. Kalish,* 690 F.2d 1144, 1147 (5th Cir.1982) (recognizing possibility that trial might resolve double jeopardy claim if district court made a pre-trial determination of no double jeopardy). We therefore hold that the district court erred in not dismissing Count V against Hood and David.

### IV. Severance

 Bedgood moved for a severance of his trial; the district court denied the motion. On a Rule 14 motion the district court is required to weigh the prejudice inherent in a joint trial against the benefit of judicial economy and to sever defendants as justice requires. *U.S. v. McLaurin,* 557 F.2d 1064, 1074 (5th Cir.1977), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978).

This court will review a denial of a motion to sever only for abuse of discretion. *U.S. v. Martino,* 648 F.2d 367, 385 (5th Cir.1981). This court's predecessor has stated:

"In determining on appeal whether the jury was in fact confused, the court will look to the verdict. Convictions will in-

---

**5.** In support of their claim of double jeopardy, defendants also point to two additional pieces of evidence, an affidavit by a DEA agent that the Hume house was under surveillance by the Delray Beach Police Department and a reference by the prosecutor in this case at the *James* hearing to the August 4, 1981 incident that formed the basis for the first indictment. While the affidavit is in the record, 5 Rec. at 598–99, its significance is unclear, because, to affect the double

jeopardy claims, the police department must have had the Hume house under surveillance for the first conspiracy, not the one presently charged. Furthermore, the record does not contain the portion of the *James* hearing at which the prosecutor allegedly referred to the incident involved in the first conspiracy. We consequently have not considered these two additional pieces of evidence in our double jeopardy analysis.

variably be sustained if it may be inferred from the verdict that the jury 'meticulously sifted the evidence,' as where it acquits on certain counts." *Tillman v. U.S.*, 406 F.2d 930, 936 (5th Cir.) (quoting, 8 Moore's Federal Practice ¶ 14.04[1], p. 14–15 (2d ed. 1968) (footnote omitted)), *vacated in part*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). Of the 17 defendants who went to trial, the jury convicted seven, acquitted seven, and was unable to reach a verdict on three. It convicted Kilpatrick and Jake on some counts but acquitted them on others. Such a verdict indicates that Bedgood was not prejudiced by being tried with the other defendants.

## V. "Coaching" of witness Joe

At the beginning of trial the district court imposed a sequestration rule on the non-party witnesses. Joe was a protected witness who was relocated under the witness protection program. Only a few U.S. marshals knew his location. Joe was interviewed by FBI agents and by the assistant U.S. attorney originally assigned to the case. However, he only met with the Assistant U.S. Attorney actually prosecuting this case approximately 30 minutes before he took the stand.

When Joe began to testify, the prosecutor's questions were imprecise, presumably because of his unfamiliarity with the witness. Defense counsel objected on the basis that there was a substantial likelihood of prejudice if Joe identified defendants on the basis of recognition without linking them to the conspiracy and that there was little probative value to such evidence. The district court called a recess to allow the prosecutor to interview Joe so that the prosecutor's questions to the witness would be more precise. The defense objected to this suspension of the sequestration rule.

■ The decision whether to allow a prosecutor to "work with" a witness is within the discretion of the trial court and will not be reviewed absent an abuse of that discretion. *U.S. v. Burke*, 495 F.2d 1226, 1233 (5th Cir.1974). A showing of prejudice is necessary for the court to find an abuse of discretion. *See id.*

■ While the defendants assert in general terms that after his coaching Joe remembered with great specificity dates and events that he had earlier been unable to recall, they do not make any specific allegations of prejudice. Furthermore, defense counsel had ample opportunity to cross-examine Joe about the interview by the prosecutor, yet no counsel was able to establish that Joe was coached. *Cf. Geders v. U.S.*, 425 U.S. 80, 89–90, 96 S.Ct. 1330, 1335–1336, 47 L.Ed.2d 592 (1976) (recognizing that skillful cross-examination can bring out the possibility of coaching a witness).

## VI. Hearsay testimony

In the middle of the trial the government called Speers to testify about his involvement with some of the defendants and the marijuana conspiracy. Speers denied any involvement with the defendants. After an FBI agent testified as to what Speers had told him, the court found that Speers's testimony was inconsistent with his prior statement and that the government was surprised by the testimony. The court declared Speers a hostile witness. Even after Speers was granted immunity and directed to answer questions by the court, he refused to testify. The court found Speers in contempt.

The court then permitted FBI agent Rubio and a Florida Department of Corrections officer, Humphries, to testify as to what Speers had previously said. It did so after conducting an evidentiary hearing and concluding that Speers's prior statement was against his penal interest and therefore, though hearsay, was admissible under Fed.R.Evid. 804(b)(3). The next trial day, Speers changed his mind, agreed to testify, and recanted his statement to Rubio and Humphries.

■ To the extent the improperly admitted evidence might raise a confrontation clause problem, Speers's subsequent taking of the stand and cross-examination by the

defendants cures this problem. We do not need to decide the 804(b)(3) issue.

■ Only Jake raised this claim on appeal. Both Archie and Joe testified to Jake's involvement in the conspiracy. Archie stated that either Jake or his brother David supplied the fuel and provisions for the Honeymoon Harbor trip. Jake went with Archie to be paid for this trip. Additionally, on the XAVIER offload trip, Jake and Archie rode on the same boat to Gun Cay, where they received approximately 15–20 bales of marijuana. After an offload of the XAVIER, Jake and David took Archie's car while Zeigler gave Archie a ride. On the JEZEBEL run, Archie identified Jake as being on the EXCALIBER at Gun Cay and as riding on the DOCK'S BABY when it was used as a blocker boat. Joe stated that Jake attended the briefing session prior to the JEZEBEL run and was on DOCK'S BABY when it served as a blocker boat for the JEZEBEL. Given this mass of evidence against Jake, if admission of Speers's statement was error it was harmless. *Lutwak v. U.S.*, 344 U.S. 604, 619–20, 73 S.Ct. 481, 490–491, 97 L.Ed. 593 (1953); *U.S. v. Poitier*, 623 F.2d 1017, 1021 (5th Cir.1980).

## VII. Jencks Act

The Jencks Act requires that after a government witness has testified on direct the government must give the defendant any statement, as defined by the Act, in the government's possession that was made by the witness relating to the subject matter that the witness has testified on. 18 U.S.C. § 3500 (1976). 18 U.S.C. Sec. 3500(e) defines "statement" as

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said

witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

Defendants challenge several rulings of the district court on potential Jencks material.

■ Bedgood asserts that the government's failure to give Jencks material to the defendants until after the witness had testified on direct was untimely and prejudicial. This argument is without merit; 18 U.S.C. Sec. 3500(a) specifically provides otherwise.

■ Defendants complain that the district court followed the wrong procedure in determining whether various material came within *Jencks*. The defendants' argument primarily involves four different categories of material: FBI agents' rough notes of interviews made on FBI 302 forms ("notes"); typed reports made by FBI agents from their interviews also made on FBI 302 forms ("reports"); a specific report made by Detective Manes that he testified contained 100 typed pages, 13 Rec. at 1278, but that the government represented consisted of only 24 pages, 16 Rec. at 1914–15; and the grand jury testimony of FBI Agent Overmeyer, who was the primary interviewer of Merrill, Archie, and Joe. Defendants assert that the district court simply considered the reports and notes to determine if there was anything inconsistent with the witness's testimony on direct.[6] Such a procedure would be improper. *See Jencks v. U.S.*, 353 U.S. 657, 668–69, 77 S.Ct. 1007, 1013–1014, 1 L.Ed.2d 1103 (1957) (defendant counsel, not court, should determine usefulness of statement to the defendant). However, while the district court made several statements to the effect that he was searching for inconsistencies, *e.g.*, 9 Rec. at 568, 10 Rec. at 694–95, 11 Rec. at 815, *id.* at 834, 12 Rec. at 1164, 15 Rec. at 1647–48, a review of the entire

---

**6.** Review of the record suggests that when the district court searched for inconsistencies between the witness's trial testimony and prior statements, it was not considering the *Jencks* claim but rather looking for material that came within *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1973). *See* 15 Rec. at 1683.

record reveals that the district court followed the proper procedure.

In explaining the procedure it had been following the district court stated that it first considered whether the report or notes were a statement within the meaning of § 3500(e)(1). *See* 15 Rec. at 1683. Because there was no indication on the faces of the reports and notes that they had been adopted or approved by any witness, the court concluded that the material did not meet the requirement of § 3500(e)(1). *Id.* at 1689–90. Defendants disputed this interpretation of the Jencks Act. *See id.* at 1687.

After concluding the material did not qualify under § 3500(e)(1), the court considered whether it qualified under § 3500(e)(2) as a recording that was a substantially verbatim recital of an oral statement. The court determined that because the reports were not from recordings made contemporaneously, they did not qualify as § 3500(e)(2) material. *Id.* at 1695–99. It also decided that the notes were not "substantially verbatim" and therefore did not qualify under § 3500(e)(2). *Id.* at 1707. The court also found as a fact that Detective Manes's report was only 24 pages long. 16 Rec. at 1916. Finally, the court ruled that Agent Overmeyer's grand jury testimony was not a substantially verbatim recital of the interviews of Merrill, Archie, and Joe within the meaning of § 3500(e)(2). *See* 9 Rec. at 566–67.

■ We review the district court determination that the material did not come within the Jencks Act under the clearly erroneous standard. *U.S. v. Judon*, 581 F.2d 553, 554 (5th Cir.1978) (per curiam). "The trial court's finding will constitute clear error where such finding either rests upon an incorrect rule of law or is inconsistent with the facts upon which it purports to rest." *Id.* at 554–55. Additionally, "[w]hether the 302's contain sufficiently extensive verbatim recitation to bring the notes within the Act is a matter of fact to

be decided by the trial court...." *Id.* at 554.

■ The district court applied an incorrect rule of law when it required the witness to have formally adopted the statement by signing the report or notes. A verbal acknowledgment that the notes or report is an accurate statement of the witness's interview is sufficient for the report or notes to qualify under § 3500(e)(1). *Campbell v. U.S.*, 373 U.S. 487, 490–92, 83 S.Ct. 1356, 1359–1360, 10 L.Ed.2d 501 (1963).

The record indicates that Merrill may on one occasion have informally approved FBI Agent Overmeyer's notes. 9 Rec. at 379. However, Agent Overmeyer, when asked informally if he had read his notes back to Merrill, stated that he had not. *Id.* at 382. At the time of this statement Overmeyer was not under oath.

■ Because it is unclear whether Merrill did approve, within the meaning of § 3500(e)(1), one set of notes and if so, which set, we conclude the case must be remanded for an evidentiary hearing on this issue.[7] The district court should ascertain whether or not Merrill informally adopted the notes and should make formal findings of fact on this. If the court concludes that this particular set of notes should have been produced under *Jencks*, the court must determine whether non-production constitutes harmless error.

■ The record reflects that Detective Manes testified that he generated a 100-page report that he gave to the government in its entirety. 13 Rec. at 1252, 1278. However, the U.S. Attorney informed the court that the government had received only a 24-page report. 16 Rec. at 1914. The district court concluded that no 100-page report existed. *Id.* at 1916. Given these conflicting versions between Detective Manes and the U.S. Attorney, the court erred in accepting the government's assertion without recalling Manes to the stand. On remand the court must determine

---

7. This remand only applies to David, Kilpatrick, Soukenik, and Bedgood as they are the only appellants to raise this claim on appeal.

whether such a 100-page report existed; if it existed, whether all or only part of it was given to the government; and if more than 24 pages was given to the government, whether non-production of this material constitutes harmless error.

█ The district court's determination that the other notes were not substantially verbatim is not clearly erroneous. This court's predecessor has recognized that "[i]nvestigators' notes of interviews do not fall under the [Jencks] Act even if they contain 'occasional verbatim recitations of phrases used by the person interviewed.'" *U.S. v. Hodges*, 556 F.2d 366, 368 (5th Cir.), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1977), (quoting *U.S. v. Cruz*, 478 F.2d 408, 413 (5th Cir.1973)). Additionally, we have reviewed the reports, and it appears that the agents sifted through the interview notes to write them. Thus the district court's determination that the typed reports did not qualify under (e)(2) is not clearly erroneous.

█ Defendants' contention that Overmeyer's grand jury testimony was a substantially verbatim recital of the interviews by Merrill, Archie, and Joe misconstrues the Jencks Act. The Act requires the government to turn over "substantially verbatim" statements of the witness that were recorded contemporaneously with the making of the statement; an FBI agent's use of the information garnered in interviews with government witnesses does not make his testimony a "substantially verbatim" statement of the government witnesses.

VIII. Reading of testimony of key government witnesses to jury after jury began its deliberation

█ The day after the jury began deliberation it requested the trial transcripts. The district court denied this request and informed the jury it would have to be more specific in its request. The jury then asked for testimony regarding specific dates on which certain events alleged in the indictment had occurred. The district court denied this request. The jury then sought the testimony of Merrill, Archie, and Joe. The district court granted this request. The defendants objected.

█ Defendants also moved to have the testimony impeaching the three witnesses read to the jury. The district court denied this motion, although it did have read to the jury the direct, cross, and recross-examination of the three witnesses. The reading of this portion of the transcript to the jury took approximately 12 hours and was spread over three days.

█ The district court has broad discretion in responding to a jury request for reading of portions of the trial testimony. *U.S. v. Quesada-Rosadal*, 685 F.2d 1281, 1283 (11th Cir.1982); *U.S. v. Alfonso*, 552 F.2d 605, 619 (5th Cir.1977). The *Alfonso* court noted that "[t]he extreme length of the rereading proceedings does not indicate prejudice *per se.*" 552 F.2d at 619 (rereading covered approximately one and one-half days of trial). The defendants have not pointed to any specific prejudice to them that occurred because of the reading of this testimony. The trial court did not abuse its discretion.

AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion.