[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12053

_____

D.C. Docket No. 2:17-cr-00016-JES-UAM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KAY F. GOW,
JOHN G. WILLIAMS, JR.

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(September 16, 2021)

Before NEWSOM, BRANCH, and LAGOA, Circuit Judges.

PER CURIAM:

Kay Gow and John Williams appeal their convictions for wire fraud and conspiracy to commit wire fraud.[1][2]  Relevant here, they were convicted of a scheme to defraud Lee County, Florida and private investors in funding a startup dietary supplement company.  Both defendants assert that the government failed to prove that they had the intent to defraud.  Viewing the evidence in the light most favorable to the government, we conclude that the government offered ample evidence from which a reasonable jury could convict the defendants beyond a reasonable doubt.  Accordingly, and with the benefit of oral argument, we affirm the defendants' convictions.

## I.    Background

### A.    Factual Background

We write primarily for the parties who are familiar with the record. Sometime around 2001, Robert Gow founded an herbal extract company called HerbalScience, LLC.  In an effort to develop HerbalScience into a market leader in dietary supplements, Robert Gow recruited investors including his friend, John Williams, whom he had known for over 25 years.  Williams invested almost $1

---

[1] Kay Gow was also convicted of conspiracy to commit money laundering and of illegal monetary transactions, but she does not appeal those convictions.

[2] Kay Gow's husband, Robert Gow, was also tried and convicted as part of the same scheme.  However, Robert is not a party to this appeal because he died after being convicted but before being sentenced.

million in HerbalScience.  However, the company failed to live up to its potential and was on the verge of bankruptcy.

In 2010, Robert Gow founded VR Laboratories, LLC, and his wife, Kay Gow, later founded VR Labs, Inc. (collectively "VR Labs").  The Gows intended to build a facility for the company that would be large enough to house both HerbalScience's extraction of chemicals from plants and VR Labs's manufacturing of products with those chemicals.  Around the same time VR Labs was founded, Jeffrey Kottkamp had completed his time as the Lieutenant Governor of Florida. Robert Gow persuaded Kottkamp to represent VR Labs and assist the company in securing public and private funding in exchange for a 5% interest in the stock of the company.

When other efforts to obtain funding were unsuccessful, VR Labs shifted focus to its "fallback" plan to build a production facility in Lee County, Florida.  In February 2011, Kay Gow, on behalf of VR Labs, applied for a $5 million grant from Lee County's Economic Development Office, whose task it was to "[w]ork[] with both the private sector and the public sector" "to energize business growth and attract new business to the area."  The application implied that VR Labs was already operating as a successful company and claimed that VR Labs was a "multinational business enterprise" that was projected to create 208 high-wage jobs

3

between 2012 and 2016.  The application also stated that VR Labs planned to contribute approximately $9 million in capital for the project over three years.

Ultimately, Lee County approved VR Labs's $5 million grant application. Then, as VR Labs's secretary, Kay Gow signed a contract governing the administration of the grant.  Among other things, the agreement required Lee County to reimburse VR Labs for any "qualified capital investment," which the agreement defined as "investments made by or on behalf of [VR Labs] for purchasing manufacturing and research and development equipment for Project facility, constructing improvements to real property on Project Site . . . , and acquiring or leasing furniture, fixtures, and equipment for the project facility."  The agreement provided further that VR Labs would employ at least 208 people by no later than the end of 2016 and have an annual payroll of approximately $13.5 million.  Finally, as noted, VR Labs was obligated to invest $9 million in the project within three years.  Lee County included this investment provision in the agreement because VR Labs had failed to provide financial information in its grant application, so the county wanted some assurance that the company had funds of its own to invest in the project—in other words, that it had "skin in the game."

With the county's grant funds in hand, the Gows began implementing their plans for VR Labs's production facility.  They recruited Williams to procure and manage the bottling equipment that VR Labs would need to package the

company's products even though he had no experience in the bottling industry. Williams then used a company he owned, Fast Response Maintenance, to do business as "Williams Specialty Bottling Equipment" ("Williams Bottling"). Williams signed a subscription agreement, stating that he would invest $1.3 million in VR Labs in exchange for a 1.3% percent interest in the company. That same day, the subscription agreement was amended to name "Hong Kong Associates," rather than Williams's company Fast Response Maintenance, as the investor even though Williams had no connection to Hong Kong. =Kay Gow then directed Williams to work with a real bottle production company, A Packaging Systems ("APACKS"), to obtain the necessary equipment.

Before Williams Bottling signed a contract with APACKS, Williams Bottling submitted an invoice to VR Labs for approximately $1.7 million for the "turnkey proprietary bottling line" that it was supposed to be getting from APACKS. Williams Bottling's invoice was approximately $500,000 more than the $1,265,584.33 pricing estimate that APACKS sent to Williams Bottling. Using a line of credit taken out by VR Labs's contractor, GCM, Kay Gow approved a partial payment for approximately $700,000 of Williams Bottling's invoice.[3] VR Labs then sent its first payment request to Lee County for Williams Bottling's $1.7

---

[3] After Gow had approved partial payment for Williams Bottling's $1.7 million invoice, APACKS sent Williams a much reduced proposal for the bottling equipment (still approximately $800,000).

million invoice, which the County paid. Thus, among other expenses, the credit that VR Labs used to pay Williams Bottling's invoice was reimbursed through the grant program.

Williams Bottling moved a portion of the funds received from VR Labs (more than $700,000) to Williams's new personal savings account, Williams then transferred $250,000 from his savings account back to Williams Bottling, and Williams Bottling transferred $320,000 to VR Labs as an investment under his subscription agreement. The same day that Williams Bottling transferred that investment payment, VR Labs paid HerbalScience a $33,333 "license fee" that was due.

Eventually, APACKS and Williams Bottling neared a final agreement for the bottling equipment. As the final proposal included several additional items to improve the efficiency of the bottling line, the initial proposal price increased by approximately $400,000. Williams Bottling agreed to the increased price and sent a new invoice to VR Labs for an $843,885 "change order." Kay Gow instructed GCM to pay Williams Bottling about 80% of that amount (again drawn from its credit line). After receiving that payment, Williams Bottling transferred $660,000 back to VR Labs, which was due under Williams's subscription agreement. Then VR Labs included the change-order invoice in its second request to Lee County for

6

reimbursement.  The county approved the request and issued VR Labs a check for approximately $1.1 million.

Ultimately, Lee County reimbursed VR Labs $4,694,548.04.  Of that amount, $2,383,154.90 went to reimburse payments VR Labs made to Williams Bottling using theline of credit that GCM obtained.  And, in turn, Williams Bottling transferred $1,430,000 of the county grant money back to VR Labs.

The money that Williams Bottling transferred to VR Labs was not used for "qualified capital investments" as required by VR Labs's agreement with the county.  Instead, VR Labs paid $267,830.22 to HerbalScience for licensing fees and a technical-services contract.  Another $691,465.18 paid for employee salaries (including $135,247.03 that went to the Gows' salaries).  And $90,587.14 of the grant money reimbursed the Gows for their "expenses," including airline tickets and expensive dinners out with each other and with Williams.  Between payments to their other company, their own salaries, and reimbursed expenses, the Gows personally obtained $552,164.39 of the county grant money that was supposed to be used only for approved capital expenditures.

Of course, the Lee County grant money was not enough to make VR Labs profitable—or even make ends meet.  For example, VR Labs owed more than $900,000 to a contractor who had completed renovating a building that was supposed to house the bottling line.  VR Labs had paid APACKS only half of what

it owed for the completed bottling equipment, so APACKS refused to ship the equipment to VR Labs. The only packaged drinks that VR Labs produced had been bottled by a contractor. And VR Labs fell behind on its rent.

To keep VR Labs afloat, Robert Gow tried to recruit investors, including Robert Haynes. Haynes had a background in biotechnologies and was interested in moving to Naples and finding a job at VR Labs. Robert Gow told Haynes that VR Labs was "full steam ahead" and starting to grow and had a job opportunity for him. When Haynes asked to see VR Labs's financial statements, Robert Gow refused the request on the grounds that ongoing merger negotiations were confidential. Haynes ultimately accepted an offer of employment, contingent on his investment of $500,000. To encourage Haynes to invest, Robert Gow falsely claimed that Kottkamp had invested $1 million. Ultimately, Haynes accepted the job and invested $500,000.

VR Labs never secured the bottling equipment, a bank foreclosed on its renovated facility, and APACKS went bankrupt.

B.    Procedural History

A federal grand jury returned an indictment charging Robert and Kay Gow with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371; four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; one count of conspiracy to commit money laundering, in violation of 18 U.S.C.

§ 1956(h); and four counts of engaging in illegal monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2. Relevant here, one of the wire fraud counts concerned Kay Gow's role in fraudulently obtaining funds from Lee County, and another was concerned with Robert Gow's attempt to induce Haynes to invest in VR Labs. Williams was charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371; and four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

The district court presided over a 12-day jury trial. Williams moved for a judgment of acquittal three times—at the close of the government's case, at the close of trial, and after the jury's verdict. The Gows also moved for judgments of acquittal at the close of the government's case and at the close of trial. The district court denied the defendants' motions.

A jury convicted the Gows on all counts and convicted Williams of conspiracy and two counts of wire fraud (he was acquitted on the other two counts of wire fraud). Kay Gow was sentenced to a total of 120 months' imprisonment followed by three years' supervised release. Williams was sentenced to a total of 30 months' imprisonment followed by three years' supervised release. Kay Gow and Williams timely appealed, challenging three of her wire fraud convictions and all of his convictions, respectively.

II.    Standard of Review

"We review both a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal *de novo*." *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011).  In doing so, "[w]e view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor, and then "determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (quotation omitted).  We will not "disturb the denial of a Rule 29 motion so long as a reasonable trier of fact could find guilt beyond a reasonable doubt." *United States v. Chafin*, 808 F.3d 1263, 1268 (11th Cir. 2015).

III.    Discussion

Both defendants appeal from the district court's denial of their respective motions for judgment of acquittal.  Specifically, both defendants argue that the government failed to present sufficient evidence to prove that they had the intent to defraud.  Gow contends that the government failed to prove that she had the intent to cause financial injury or loss to Lee County or to Haynes as an investor.  In her view, the evidence presented at trial established that she did everything in her power to ensure the success at VR Labs and that Haynes was a sophisticated investor who had been advised of the risks of investing in VR Labs.  Similarly, Williams maintains that the evidence presented at trial demonstrated that he acted

10

in good faith to ensure the success of VR Labs and that he lacked any intent to defraud.

To prove that a defendant committed wire fraud, the government must show that the defendant: "(1) participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud." *United States v. Machado*, 886 F.3d 1070, 1082–83 (11th Cir. 2018). "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). "Intent to defraud" means "inten[t] to use deception to cause some injury"—meaning "to obtain, by deceptive means, something to which the defendant is not entitled." *United States v. Waters*, 937 F.3d 1344, 1352 (11th Cir. 2019); *Maxwell*, 579 F.3d at 1301 ("An intent to defraud may be found when the defendant believed that he could deceive the person to whom he made the material misrepresentation out 'of money or property of some value.'" (quoting *United States v. Cooper*, 132 F.3d 1400, 1405 (11th Cir. 1998))). Intent may be inferred "from the defendant's conduct and circumstantial evidence." *Machado*, 886 F.3d at 1083. Circumstantial evidence of fraudulent intent is sufficient because "[g]uilty knowledge can rarely be established by direct evidence, especially in respect to fraud crimes which, by their

11

very nature, often yield little in the way of direct proof." *United States v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998). Critically, "[p]unishment under the wire fraud statute is not limited to successful schemes." *United States v. Ross*, 131 F.3d 970, 986 (11th Cir. 1997). "The Government merely needs to show that the accused intended to defraud his victim and that his or her communications were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (quotation omitted).

To prove that a defendant is guilty of conspiracy to commit wire fraud, the government must show: "(1) a conspiracy to commit wire fraud; (2) knowledge of the conspiracy; and (3) that [the defendant] knowingly and voluntarily joined the conspiracy." *United States v. Feldman*, 931 F.3d 1245, 1257 (11th Cir. 2019) (alteration adopted). The government may prove a defendant's participation in a conspiracy to defraud by direct evidence or "infer[ence] from circumstantial evidence," *Ross*, 131 F.3d at 980, provided that the inferences are reasonable, *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015). And, "[e]vidence that a defendant personally profited [from a fraud] . . . may provide circumstantial evidence of [the defendant's] intent to participate in that fraud." *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011) (quotation omitted).

Finally, because the jury is free to choose between reasonable conclusions to be drawn from the evidence presented at trial, "[i]t is not necessary for the

12

evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006) (quotation omitted).  We must uphold the denial of a motion for judgment of acquittal as "long as a reasonable trier of fact could find guilt beyond a reasonable doubt." *Chafin*, 808 F.3d at 1268.

A.    Kay Gow's Intent to Defraud Lee County

Kay Gow argues that the district court erred in denying her motion for judgment of acquittal because the government failed to prove that she intended to defraud Lee County.  Her argument is unpersuasive.

The evidence presented at trial was sufficient to support her conviction.  To begin, in VR Labs's application for grant funding, Kay Gow claimed that the company was a "multinational business enterprise," and that its office in Lee County would be its "[i]nternational headquarters office."  But, at the time, VR Labs had been incorporated for only three months, had no other offices (much less any international offices), and had not yet sold any products.

Kay Gow's application also claimed that VR Labs would invest almost $9 million in capital investments over three years.  As a Lee County executive explained at trial, the capital investment commitment from grant applicants was designed to ensure that companies would have some "skin in the game."  But, at the time Kay Gow submitted VR Labs's application, VR Labs had no assets and no

13

income to spend—VR Labs even required its subcontractors to obtain independent funding for projects to get the company up and running.

In addition, Kay Gow admitted that she and her husband hired their friend Williams to produce VR Labs's bottling equipment even though he had no experience in the bottling industry. Moreover, she admitted that she and her husband knew that VR Labs could have saved a substantial amount by contracting directly with a bottling manufacturer, rather than hiring Williams to act as a middleman with APACKS. Kay Gow knew that Williams doubled the invoices he received from APACKS and submitted his own inflated invoices to VR Labs. The company's financial situation notwithstanding, she accepted these inflated invoices and then submitted them to Lee County for reimbursement.

Even though Kay Gow admitted that she knew that the grant funds could be used only for "qualified capital investments," as head of finances at VR Labs, she also knew that Lee County grant funds were being used to pay for other non-qualified costs, such as HerbalScience license fees and the Gows' expense reports and salaries. The grant funds that paid Kay Gow's salary were, in turn, eventually spent on lavish vacations, home mortgages, and leases on luxury vehicles.

Based on this and other evidence, a reasonable jury could have concluded beyond a reasonable doubt that Kay Gow knowingly misrepresented the nature of VR Labs in its grant application because the company had no international

14

footprint or ability to make its own $9 million capital investment. A reasonable jury could have also concluded that Kay Gow knowingly requested payment from Lee County for funds to which VR Labs was not entitled under the terms of the grant and used those funds to enrich herself and her husband. In short, a reasonable jury could construe this evidence as "concealment of a material fact calculated to deceive another out of money or property." *Maxwell*, 579 F.3d at 1299. And, from the same evidence, a reasonable jury likewise could have concluded beyond a reasonable doubt that Kay Gow conspired with her husband and Williams to defraud Lee County. *See Ross*, 131 F.3d at 980; *Bradley*, 644 F.3d at 1239.

Kay Gow argues that there are innocuous explanations for her conduct, but none of the explanations demonstrates that a reasonable jury could not have found beyond a reasonable doubt that she intended to defraud Lee County. First, she takes out of context a prosecutor's isolated statement during trial that Lee County "did not receive what it bargained for," because it "never got the pilot plant, they never got the jobs that were promised pursuant to the agreement." Thus, she contends that the government's case against her rested on a breach of contract theory, which cannot support a conviction for federal wire fraud. We disagree. The government's case was based on the evidence that we have summarized, notwithstanding the prosecutor's stray comment that may have roughly alluded to

15

breach of contract principles.  Moreover, the district court properly instructed the jury that "[a] statement or representation is false or fraudulent if it is about a material fact that the speaker knows is untrue, or makes with reckless indifference to the truth, and makes with the intent to defraud." *See United States v. Clay,* 832 F.3d 1259, 1311 (11th Cir. 2016).  Accordingly, a reasonable jury could have concluded that Kay Gow promised to create jobs to secure the grant award while knowing—or being recklessly indifferent to the possibility—that VR Labs would not be able to fulfill that promise.

Second, Kay Gow argues that Williams's inflated bottling invoices were defensible because Lee County approved the expenditures, Williams was providing engineering services, and Williams's bill included the cost of developing proprietary software for the bottling equipment.  But she points to no evidence showing that Lee County knew that APACKS invoiced Williams for only half the amount he then charged VR Labs.  And a reasonable jury could have inferred that Kay Gow knew none of these price justifications were true because Williams had no experience with bottling equipment, and neither he nor his son knew anything about developing the necessary software.

And third, Kay Gow contends that she did not intentionally misrepresent VR Labs's position in its application for grant funding because VR Labs intended to become a multinational company, and her financial representations were

16

"aspirational" and nothing more than mere "puffery." While that may be one interpretation of the evidence, it does not establish that a reasonable jury could not have found that Kay Gow intentionally misled Lee County officials to secure the award of grant funding.

In sum, a reasonable jury could have concluded beyond a reasonable doubt that Kay Gow intended to defraud Lee County by making material misrepresentations to obtain the grant funding. *See Chafin*, 808 F.3d at 1268. Accordingly, the district court did not err in denying her motion for judgment of acquittal on this issue.[4]

B.    Kay Gow's Intent to Defraud Haynes[5]

Next, Kay Gow argues that the district court erred in denying her motion for judgment of acquittal because the government failed to prove that she intended to defraud Haynes. We disagree.

---

[4] We note that Kay Gow testified on her own behalf at trial and disclaimed any intent to defraud anyone. Of course, the jury was free to reject her testimony and conclude that she did in fact intend to defraud. *See United States v. Hasner*, 340 F.3d 1261, 1272 (11th Cir. 2003); *United States v. Mejia*, 82 F.3d 1032, 1038 (11th Cir. 1996) ("A proper inference the jury can make from disbelieved testimony is that the opposite of the testimony is true."), *abrogated on other grounds by Bloate v. United States*, 559 U.S. 196, 203 n.5 (2010).

[5] Although Kay Gow was not involved in the efforts to recruit Haynes, she "is liable for any act done by a co-conspirator in furtherance of the conspiracy." *United States v. Loyd*, 743 F.2d 1555, 1561 (11th Cir. 1984). And, as discussed in subsection (A), a reasonable jury could have found that Kay Gow conspired with her husband and Williams to defraud Lee County. *See Ross*, 131 F.3d at 980; *Bradley*, 644 F.3d at 1239.

17

In addition to the previously mentioned evidence regarding Kay Gow's involvement in the conspiracy, at trial, the government introduced evidence concerning VR Labs's attempts to recruit investors.  That evidence established that, at the time that VR Labs was running out of grant funds from Lee County, Robert Gow and Kottkamp began recruiting investors to keep VR Labs afloat. Haynes was one of those potential investors.  Haynes had experience working at a biotechnology company and specialized in prescription pharmaceuticals.  After learning about VR Labs, he expressed interest in working for VR Labs because it was based in an attractive retirement location and had the potential to expand into pharmaceutical products.  Eventually, in early September 2012, Robert Gow met Haynes for lunch and told him that VR Labs might have a position available. Robert Gow represented that VR Labs was moving "full steam ahead" with its plans for product expansion and that the "company was starting to grow."  He also represented that VR Labs was considering a merger with another company, and that the potential value of the merger was approximately $375 million.

In fact, VR Labs was in dire straits.  It had exhausted (or nearly exhausted) the Lee County grant funds in May 2012.  For example, VR Labs still owed its bottling equipment manufacturer approximately $1.25 million and some of its subcontractors were "on the verge of bankruptcy as a result of nonpayment" and threatening to sue VR Labs.  VR Labs was also falling behind on monthly rent for

18

its bottling facilities because it had no functioning bottling plant to generate income. At one point in September 2012, VR Labs's bank account contained less than $4,000.

During their conversation, Haynes indicated that, before he signed any employment contract, he wanted to see VR Labs's financial statements. Robert Gow refused to provide Haynes with any financial records, claiming that the ongoing merger negotiations rendered the records confidential. **[*Id.*]** In mid-September 2012, Gow offered a job to Haynes on the condition that he invest $500,000. Gow then told Haynes that Kottkamp had invested $1 million in VR Labs, which "was a big deal" to Haynes as he weighed the "pros and cons" of investing a substantial amount of his own money. In truth, Kottkamp never invested in VR Labs and, by the fall of 2012, VR Labs was not able to pay him his $240,000 salary. Kottkamp resigned shortly thereafter.

Viewing the evidence in the light most favorable to the government, a reasonable jury could have found beyond a reasonable doubt that Kay Gow intended to defraud Haynes. The evidence demonstrated that VR Labs was in dire need of cash to continue operating, which prompted it to raise capital from investors. And, when dealing with potential investors—including Haynes—the evidence established that Robert Gow misrepresented the company's financial condition by portraying it as a well-capitalized merger target, and falsely claiming

19

that Kottkamp had invested $1 million.  Robert Gow then refused to disclose the company's financial statements.  From this evidence, a reasonable jury easily could have concluded that Robert Gow (and Kay Gow as a co-conspirator) materially misrepresented VR Labs's financial condition and prospects with the intent to entice Haynes to invest $500,000.  *See Maxwell*, 579 F.3d at 1299 ("A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property.").

Kay Gow has two responses, but neither is persuasive.  First, she contends that Haynes was a sophisticated investor and that his employment agreement advised him of the risks associated with investing in a start-up company in a competitive market.  But boilerplate language about the risks of investment cannot displace specific misrepresentations about VR Lab's financial condition.  Only the Gows knew the truth, and a reasonable jury could have concluded that Haynes remained unaware that VR Labs was on the verge of collapse even after reviewing the agreement.  Regardless, "[p]unishment under the wire fraud statute is not limited to successful schemes." *Ross*, 131 F.3d at 986.  The government need only "show that the accused intended to defraud his victim and that his or her communications were reasonably calculated to deceive persons of ordinary

20

prudence and comprehension." *Id.* In short, Kay Gow's culpability is independent from any alleged risk assumed by Haynes.

Second, Kay Gow maintains that Haynes's employment agreement accurately listed the shares, shareholders, and the amount of capital the shareholders had contributed, and that Kottkamp's name and purported contribution were conspicuously absent. She also notes that the agreement stated that Haynes had the opportunity to ask questions about the condition of the company and that he was satisfied by the answers to those questions. Thus, she argues that Haynes could not have been misled. But this argument also misses the point. "Punishment under the wire fraud statute is not limited to successful schemes," and the government need only "show that the accused intended to defraud his victims and that his or her communications were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Ross*, 131 F.3d at 986; *Machado*, 886 F.3d at 1082–83. A reasonable jury could have concluded that the misrepresentations and omissions "were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Ross*, 131 F.3d at 986.

At most, Kay Gow has shown that a jury could have interpreted the evidence in a way that was favorable to her defense. But, as we explained, a reasonable jury could have concluded beyond a reasonable doubt that she intended to defraud

Haynes.  Accordingly, the district court did not err in denying her motion for judgment of acquittal on this issue.[6]  *See Chafin*, 808 F.3d at 1268.

C.      Williams's Intent to Join the Conspiracy to Defraud

Finally, Williams argues that the district court erred in denying his motion for judgment of acquittal because the government presented no evidence—direct or circumstantial—showing he was a willing participant in a criminal scheme.  We disagree.

The government presented an array of circumstantial evidence against Williams.  Williams personally invested hundreds of thousands of dollars in VR Labs.  Thus, he had much to lose if VR Labs folded and, therefore, a motive to ensure that VR Labs survived and he recovered his investment.  As noted earlier, he was hired to produce the company's bottling line—despite having no experience in that field.  Williams, in turn, hired a subcontractor to produce the bottles and bottling equipment and nearly doubled his own invoice to VR Labs, which Lee County ultimately reimbursed.  Then, when VR Labs paid Williams's invoices with county grant funds, he used a fictitious entity, "Hong Kong Associates," to

---

[6] Kay Gow also claims that Haynes was unsuccessful in a civil lawsuit that he brought against VR Labs.  She suggests that, if Haynes could not succeed in a civil suit under a preponderance-of-the-evidence standard, then the government cannot prevail against her under the beyond-a-reasonable-doubt standard.  The merits of Haynes's civil lawsuit are not part of the record and are therefore not relevant to whether a reasonable jury could have convicted Kay Gow of wire fraud related to Haynes's investment based on the evidence presented in this case.

22

transfer large sums of money back into VR Labs's accounts.  When FBI agents questioned him about his practice of doubling the amount charged on invoices to VR Labs, Williams claimed that he was a "farmer and a gambler" and farmers double the price of everything.  He also claimed that the inflated invoices were meant to cover his son's expenses in developing software for the new bottling equipment.  Yet in reality, his son had no experience in software development and ultimately failed to produce it.

Viewing all this evidence in the light most favorable to the government, a reasonable construction of the evidence allowed the jury to find the defendant guilty beyond a reasonable doubt.  In other words, a reasonable jury could infer that Williams knew of the plan to defraud Lee County and intended to join the conspiracy to do so.

At bottom, Williams responds that "the government did not provide or present a sufficient degree, quantity, or quality of competent and reliable evidence that would show or establish" that "Williams possessed even a general understanding of the alleged fraud (if it even existed) or that . . . he willfully joined any purported plan to defraud Lee County."  Considering all the evidence just described, we are not persuaded.  Although Williams might "disagree[]" with the interpretation of the evidence, mere disagreement about the best way to read the

23

evidence presented at trial is insufficient to show that no reasonable jury could have convicted him.

Accordingly, the district court did not err in denying Williams's motion for judgment of acquittal.

## IV.  Conclusion

For these reasons, we affirm the district court's judgment.

**AFFIRMED.**