**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Fernando NINO, Gabriel Nino, Najah Da-**
**wood Konja, Issam Hermiz, Hector Al-**
**varez, Basil Mezy, Defendants–Appel-**
**lants.**

No. 90–3622.

United States Court of Appeals,
Eleventh Circuit.

Aug. 6, 1992.

Ronald J. Marzullo, St. Petersburg, Fla., for Gabriel Nino.

Richard M. Lustig, Birmingham, Ala., for Konja.

N.C. Deday LaRene, Detroit, Mich., for Hermiz.

David K. Weisbrod, Tampa, Fla., for Alvarez.

Manuel A. Machin, Tampa, Fla., for Mezy.

Joseph Ruddy, Asst. U.S. Atty., Karla Spaulding, Asst. U.S. Atty., Tampa, Fla., for U.S.

Before FAY and EDMONDSON, Circuit Judges, and ATKINS *, Senior District Judge.

EDMONDSON, Circuit Judge:

A jury in the Middle District of Florida convicted Fernando Nino, Gabriel Nino, Najah Dawood Konja, Issam Hermiz, Hector Alvarez, and Basil Mezy of one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846, three counts of interstate travel with the intent to promote and facilitate the conspiracy in violation of 18 U.S.C. §§ 1952(a)(3) and (2), and four counts of cocaine distribution in violation of 21 U.S.C. § 843. We AFFIRM their convictions and sentences.

*Facts*

Defendants Konja, Hermiz, and Mezy were members of a group that wanted to establish a drug trafficking trade in Detroit.[1] They negotiated with Alvarez in

Arthur S. Corrales, Tampa, Fla., for Fernando Nino.

---

* Honorable C. Clyde Atkins, Senior United States District Judge for the Southern District of Florida, sitting by designation.

1. Others indicted were Ead Ballo, Heriberto Otalvaro, and Victor Trevino Pulido. Khairi ("Harry") Kalasho was the group's leader until his death in March 1989. Salwan Askar, a coop-

Tampa, Florida to start a cocaine business.[2] Alvarez' son-in-law, Fernando Nino, had access to large quantities of cocaine via Queens, New York, and Nino's brother, Gabriel, agreed to help transport the cocaine to Detroit.

From September 1988 to January 1989, the Ninos made several trips to Detroit. The business temporarily came to a halt on February 9, 1989, when the Ninos were arrested in Los Angeles, California by the Drug Enforcement Administration ("DEA") for a cocaine delivery the Ninos made from a Los Angeles warehouse to a confidential informant for distribution in the Los Angeles area. The Ninos were indicted in the Central District of California for conspiracy to possess with intent to distribute cocaine. The brothers pled guilty and were incarcerated.

In the meantime, Anthony Montello, a government witness, taped several telephone conversations disclosing Alvarez, Konja, and Hermiz's interest in finding a new source of cocaine. When the group was unable to come up with a supplier, an undercover agent set up a reverse sting operation which ultimately led to the arrest of Konja, Hermiz, and Mezy. Alvarez was arrested in Florida two months later.

Both Gabriel and Fernando Nino filed pretrial motions to dismiss the conspiracy count based on double jeopardy grounds; both motions were denied. After the trial the Ninos filed a motion for a transcript of trial testimony to supplement their motions to dismiss. This motion was granted, but their later supplemental motions to dismiss and motions for evidentiary hearing on the double jeopardy issue were denied.

On appeal, defendants raise many issues regarding their convictions and sentences, but we find only two issues merit discussion: the Ninos' double jeopardy claim and Konja's challenge to his sentencing enhancement for firearm possession.[3]

*The Ninos' Double Jeopardy Claim*

 The Ninos argue that their prosecution in Florida is based on the same conspiracy to which they pled guilty in California and therefore violates the double jeopardy clause.[4] In pretrial double jeopardy proceedings, defendants have the burden of establishing a prima facie nonfrivolous double jeopardy claim, *United States v. Stricklin*, 591 F.2d 1112, 1117–18 (5th Cir.1979);[5] if they make the necessary showing, the burden of persuasion shifts to the government to show by a preponderance of the evidence that the indictments actually charge separate crimes. *United States v. Loyd*, 743 F.2d 1555, 1562–63 (11th Cir.1984).

Because the district court proceeded to trial in this case, ... we have the record of the second trial to help us determine whether the indictments involved different conspiracies. The court might first consider the pretrial record alone, and then, if it determined that the govern-

erating witness for the government, admitted under oath that he had also been a conspirator.

**2.** An attempt in spring 1987 failed; the group made more successful arrangements in spring 1988.

**3.** We affirm without discussion the district court's decisions on (1) the sufficiency of evidence to convict Mezy and the Ninos; (2) the denial of the requested buyer-seller instruction; (3) the admission of evidence of the reverse sting transaction; (4) the admission of lay witness testimony regarding tape-recorded conversations; (5) the alleged variance between the conspiracy charged and evidence introduced at trial; (6) Mezy's role in the offense; (7) Alvarez' role in the offense; (8) Alvarez' acceptance of

responsibility; (9) Konja's role in the offense; and (10) the Ninos' consecutive sentences.

**4.** The Double Jeopardy Clause provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The heart of this clause is the prohibition against multiple prosecutions for the same offense. *Jeffers v. United States*, 432 U.S. 137, 150, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977).

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (*en banc*), this court adopted as precedent decisions of the former Fifth Circuit Court of Appeals decided before October 1981.

ment was entitled to prevail on the pretrial motion, consider the trial record to determine if the appellant was actually tried for the same offense.

*United States v. Kalish,* 690 F.2d 1144, 1147 (5th Cir.1982). We think the government in this case met its pretrial burden of proving that the indictments concerned different conspiracies; the trial record and result confirms that conclusion.

Because "[t]he gist of the crime of conspiracy ... is the agreement ... to commit one or more unlawful acts," *United States v. Broce,* 488 U.S. 563, 109 S.Ct. 757, 763, 102 L.Ed.2d 927 (1989) (citation omitted), the government had to show more than one agreement. The following factors determine if more than one agreement exists:

> (1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.

*United States v. Benefield,* 874 F.2d 1503, 1506 (11th Cir.1989) (quoting *United States v. Marable,* 578 F.2d 151, 154 (5th Cir. 1978)).

■ That the Ninos pled guilty to the California conspiracy charge makes it "particularly difficult, because of the absence of a trial record in the first case, to determine whether the conspiracies arose from one unlawful agreement or two." *See Benefield,* 874 F.2d at 1506. So, for a pretrial double jeopardy analysis, the district court is permitted to look beyond the indictment to extrinsic evidence to decide whether double jeopardy exists. *Id.* An examination of the government's proffer may, at that point, be sufficient to establish that two separate crimes are charged, *id.,* and that is what occurred in this case. The government provided for the district court both Florida and California indictments, as well as telephone transcripts and affidavits. *See infra.* An examination of the government's proffer using the *Marable* analysis compels us to agree with the district court's pretrial conclusion that the two indictments refer to two separate agreements.

### Time

■ The California indictment involves behavior beginning on an unknown date and continuing to on or about February 9, 1989. The overt acts alleged in that indictment specify only two dates: February 8–9, 1989. The Florida indictment involves behavior on or about spring 1987 to on or about June 23, 1989. Although the time frames for the two conspiracies overlap, this factor is not conclusive; the remaining factors, with the exception of the statutory offense comparison,[6] militate in favor of finding separate conspiracies.

### Co-conspirators

Fernando Nino and Gabriel Nino are the only conspirators indicted in both California[7] and Florida.[8] The Ninos' commonality to both indictments is, by itself, insufficient to show a single conspiracy. *See Kotteakos v. United States,* 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1242–43, 90 L.Ed. 1557 (1946) (participation of single common actor in what are allegedly two sets of conspiratorial activities fails to establish existence of single conspiracy); *United States v. Peyro,* 786 F.2d 826, 829 (8th Cir.1986) (single conspiracy is unproved by mere overlap of

---

**6.** Identity of the statutory offense is the least important of the *Marable* factors. *United States v. Sturman,* 679 F.2d 840, 843 (11th Cir.1982).

**7.** The Ninos are listed as Fernando Andrade and Gabriel Andrade in the California indictment.

**8.** The California indictment charges Fernando Andrade, Gabriel Andrade, William Arias, and

Erwin Gonzalez. The Florida indictment charges Fernando Nino, Gabriel Nino, Heriberto Otalvaro, Hector Alvarez, Victor Trevino, Najah Dawood Konja, Ead Ballo, Issam Hermiz, and Basil Mezy.

personnel or knowledge of another's illegal conduct). In addition, transcripts of tape-recorded telephone calls between other members of the Detroit conspiracy show that these conspirators were confused and uncertain as to why the Ninos were in California at the time of their arrest. This confusion suggests the Ninos were involved in conduct not part of this conspiracy. *See* First Supp. Record on Appeal, Vol. 1, Exhibits 4 & 5.

### Statutory Offenses/Overt Acts

■ The statutory offenses are identical: violation of 21 U.S.C. § 846, contrary to 21 U.S.C. 841(a)(1). But it is possible to have two different conspiracies to commit exactly the same kind of crime. *United States v. Robinson*, 774 F.2d 261, 275 (8th Cir. 1985) (quoting *United States v. Thomas*, 759 F.2d 659, 666 (8th Cir.1985)). The stipulated facts filed when the Ninos pled guilty to the California indictment detail nine overt acts that took place over a two-day period. These acts constituted a single delivery of cocaine by the Ninos from a Los Angeles warehouse to a confidential informant for distribution in Los Angeles. In contrast, the Florida indictment broadly charges conspiracy and cocaine distribution activities.

### Places

The California indictment refers only to activities in California. The Florida indictment includes activities in Queens, New York, Chicago, Illinois, Detroit, Michigan, and Tampa, Florida, but makes no reference whatsoever to California. Likewise, law enforcement investigations were geographically—and factually—independent: the affidavit of FBI agent Manuel Perez, who investigated the Florida/Detroit conspiracy, states that before the Ninos' arrest, Perez had no knowledge of a DEA investigation targeting the Ninos in California in February 1989.

Applying the *Marable* factors to the information available to the district court pretrial convinces us that the Florida and California indictments allege two separate and distinct conspiracies. In *Benefield*, we wrote:

> While the Galveston Indictment appears to involve only the discrete sale of 761 pounds of marijuana by two undercover DEA agents to defendant Benefield through two individuals named Gassoway and Blitz, if that purchase of contraband by Benefield was designed and intended to be sent ... for distribution in Georgia, the Galveston conspiracy would simply be a small portion of the broadly charged Atlanta conspiracy, and the Atlanta conspiracy, as charged, would therefore be barred by the command of double jeopardy. *If, on the other hand, the 761 pounds was intended for a different distributee or purchaser, perhaps at a different location, then the Atlanta charge would not be barred by the Galveston plea and sentence, for a defendant may be involved in more than one conspiracy during the same period of time.*

*Benefield*, 874 F.2d at 1508 (emphasis added).[9] In the present case, the government's proffer sufficiently proved that the Ninos' February 1989 delivery in California was intended for a different buyer in a different location from that expected or agreed to by the Detroit conspirators. *See also Sturman*, 679 F.2d at 843 (acquittal under Ohio indictment charging violation of federal obscenity laws did not preclude prosecution under Florida indictment charging same offense during different time where no evidence linked Ohio defendants to Florida and only two of seven Ohio defendants named in Florida indictment); *United States v. Henry*, 661 F.2d 894, 896–

---

**9.** The *Benefield* court remanded for an evidentiary hearing because of an overlap in time, defendant's offenses and similarity in geographic reach of the crimes alleged. The *Benefield* case had come to us before trial.

97 (5th Cir.1981)[10] (although periods overlapped and both conspiracies involved distribution of cocaine, acquittal on one indictment did not bar prosecution on remaining indictment where one conspiracy centered in Detroit with some overt acts in Atlanta and Tampa, and other conspiracy involved acts in Dallas and Atlanta; evidence showed only one person common to both conspiracies, notwithstanding that some persons implicated in one or both conspiracies were business acquaintances; and evidence failed to show cooperation between two groups).

Our conclusion is bolstered by the trial in this case, where the evidence likewise comports with a showing of more than one agreement under *Marable.*[11] Cf. *Kalish*, 690 F.2d at 1147 (government did not meet pretrial burden of proving indictments concerned separate conspiracies and trial record confirms that conclusion). The Ninos argued at trial that they had already been punished for their role in the conspiracy.[12] And the jury was instructed on the difference between single and multiple conspiracies. Inherent in the jury's verdict that the Ninos were guilty is the conclusion—beyond a reasonable doubt—not only that the Ninos were participants in the Florida/Detroit drug activities, but also that the brothers had not yet been prosecuted or punished for these activities. The government's pretrial showing, trial evidence, and trial result persuade us that the Ninos were not subjected to double jeopardy.

### Konja's Sentencing Enhancement for Firearm Possession

The district court enhanced Konja's base offense level by two levels for firearm possession during the commission of the offense. Konja himself possessed no firearms; evidence at trial showed Konja's presence at drug negotiations when Harry Kalasho, the leader of the conspiracy, possessed a firearm in Detroit; and Askar, an unindicted co-conspirator, possessed several weapons in Tampa.

In *United States v. Otero*, 890 F.2d 366 (11th Cir.1989) (per curiam), this court decided that Sentencing Guideline § 2D1.1(b)(1) permits sentence enhancement based on firearm possession by a co-conspirator when three requirements are satisfied: (1) the possessor must be charged as a co-conspirator; (2) the co-conspirator must be found to have possessed the firearm in furtherance of the conspiracy; and (3) the defendant who is to receive the enhanced sentence must have been a member of the conspiracy at the time of the firearm possession. *Id.* at 367.

**10.** In *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir.1982), this court adopted as precedent all decisions of Unit B of the former Fifth Circuit Court of Appeals.

**11.** We disagree with the Ninos' assertion that the trial testimony of Anthony Montello and Salwan Askar necessarily supports their double jeopardy claim. Anthony Montello testified that he brokered sales of cocaine with Fernando Nino to Detroit, New York/New Jersey and Los Angeles; and Salwan Askar testified that on one occasion in Detroit he received cocaine from Nino agents from Orange County, California; and Los Angeles DEA agent Donald Torres testified that a confidential informant in Los Angeles told the DEA that Nino had five offices, including Los Angeles, Miami, New York, Chicago and Detroit. At most, this testimony might show that Fernando Nino was delivering cocaine from Los Angeles to other cities; it does *not* prove that Nino's connections in California

were shared by the rest of the Detroit conspiracy.

**12.** In his closing statement, Fernando Nino's counsel argued that instead of one overreaching conspiracy, the Florida indictment charged the activities of three conspiracies: (1) the conspiracy in the spring of 1987, when the Detroit and Florida group was unable to come up with a source of cocaine and/or there was a problem with the price of cocaine; (2) the conspiracy beginning in the spring of 1988, allegedly involving Nino's dealings in Los Angeles, and a plan between Fernando and Harry Kalasho to supply cocaine from Los Angeles to Detroit, ending with Nino's arrest and Kalasho's death; and (3) the conspiracy from February 9, 1989 to the arrest of the Detroit group later that summer. Nino's counsel did not expressly argue double jeopardy in his closing, but suggested that Fernando Nino had already been prosecuted and punished for his role in the second conspiracy.

Konja argues his enhancement was improper because neither Kalasho nor Askar were charged co-conspirators.[13] We disagree.

At the outset, we note that nowhere in the *Otero* opinion is it said that enhancement is allowable only if the three conditions set out in the opinion are met. The *Otero* court faced a case in which certain facts existed and held that, given the facts before the court, enhancement was permitted by the guidelines. The words of *Otero*, like the words of every judicial opinion, must be read in the context of the particular facts of the case. "[G]eneral expressions, in every opinion are to be taken in connection with the case in which those expressions are used ..." *Cohens v. Virginia*, 19 U.S. 264, 399, 5 L.Ed. 257 (1821) (Marshall, C.J.).[14]

The *Otero* reasoning avoids artificial sentence enhancement for firearm possession when the weapon is actually or constructively possessed by a person outside the conspiracy (for example, an undercover agent, confidential informant, or other non-conspirator). *See also United States v. Missick*, 875 F.2d 1294, 1301–02 (7th Cir. 1989) (reversing weapon-possession enhancement where firearms were possessed only by recipients of cocaine and recipients were not charged as co-conspirators). Such a rule is necessary because firearm possession by those who are in contact with—but not members of—a drug-trafficking conspiracy is not an act in furtherance of the conspiracy. *See Pinkerton,*

328 U.S. at 647, 66 S.Ct. at 1184 (conspirator's overt act must be in furtherance of conspiracy for purposes of co-conspirator liability for substantive offense); U.S.S.G. § 1B1.3, commentary n. 1 (where conduct is neither within scope of defendant's agreement nor reasonably foreseeable in connection with criminal activity defendant agreed to jointly undertake, conduct not included in establishing offense level).

■ In this case, Kalasho died before the conspiracy ended, and Askar cooperated with the government in exchange for immunity. But these events in no way negate their participation in the conspiracy or their use of firearms to further the group's mission. Given *Otero*'s facts, *Otero*'s holding remains good law in this circuit; but the rules of co-conspirator liability as explained in *Pinkerton* and the Sentencing Guidelines do not require that the firearm possessor be a *charged* co-conspirator when that co-conspirator dies or is otherwise unavailable for indictment. To the extent, if any, the *Otero* opinion's words— as distinguished from the *Otero* decision— suggest otherwise, those words are dicta and are not the law.

■ The district court in this case found both Kalasho and Askar were co-conspirators who possessed firearms in furtherance of the conspiracy at a time when Konja was a member of the conspiracy.[15] Given the deference due district courts' factual determinations for sentencing purposes, we

---

**13.** That the last two *Otero* conditions were met in this case is undisputed.

**14.** It seems worthwhile to quote Chief Justice Marshall more fully on precedent and legal authority; the Chief Justice, incidentally, was writing in *Cohens* to explain the inapplicability of his own opinion in *Marbury v. Madison*, 5 U.S. 137, 2 L.Ed. 60 (1803):

> It is a maxim not to be disregarded that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.... The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles

which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.
*Cohens*, 19 U.S. at 399.

**15.** Konja's claim that he was unaware of Askar and Kalasho's firearm possession does not preclude enhancement. *See United States v. Martinez*, 924 F.2d 209, 210 and n. 1 (11th Cir.1991) (enhancement sustained despite defendant's alleged lack of knowledge of co-conspirator's firearm possession if possession "reasonably foresee[able] as a necessary or natural consequence of the unlawful agreement") (quoting *Pinkerton v. United States*, 328 U.S. 640, 648, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946)).

cannot say these findings are clearly erroneous. We therefore AFFIRM the district court's decision to enhance Konja's base offense level for firearm possession.

ATKINS, District Judge, dissenting:

While I concur in the balance of the majority opinion, I respectfully dissent from the majority's conclusion that the district court correctly enhanced defendant Konja's base offense level for firearm possession.

Under the Sentencing Guidelines, "[i]f a firearm or other dangerous weapon was possessed during the commission of the offense, increase [the offense level] by 2 levels." U.S.S.G. § 2D1.1(b). In this Circuit, sentence enhancement for a co-conspirator's possession of firearms is proper if three conditions are met:

> first, the possessor must be charged as a co-conspirator; second, the co-conspirator must be found to have been possessing the firearm in furtherance of the conspiracy; and third, the defendant who is to receive the enhanced sentence must have been a member of the conspiracy at the time of the firearms possession.

*United States v. Otero*, 890 F.2d 366, 367 (11th Cir.1989) (per curiam) (citing *United States v. Missick*, 875 F.2d 1294, 1301–02 (7th Cir.1989)); *see also United States v. Martinez*, 924 F.2d 209, 210 (11th Cir.1991) (reiterating *Otero* test), *cert. denied*, *Duarte v. United States*, —— U.S. ——, 112 S.Ct. 203, 116 L.Ed.2d 163 (1991).

In this case, the actual possessors of the firearms, Kalasho and Askar, were not charged as co-conspirators. Arguably, they could qualify as "those persons known and unknown to the Grand Jury" who participated in the conspiracy. However, this argument was rejected in *United States v. Missick*, a Seventh Circuit case cited favorably in *Otero*, where the court held that a firearm sentence enhancement may not be based on possession by a person who has not been named in the indictment. *Missick*, 875 F.2d at 1301–02. This is so even if the indictment charges "persons known and unknown" in the conspiracy. *Id.* Because Kalasho and Askar were not charged in the indictment, I believe that the district court erred in departing from the sentencing guidelines.

The majority's broad reading of *Otero* in the present case is contrary to the Sentencing Commission's intent that courts impose sentences based on charged conduct as opposed to actual conduct. In explaining why it chose a "charged offense" system, the Sentencing Commission stated that it found "no practical way to reconcile the need for a fair adjudicatory procedure with the need for a speedy sentencing process given the potential existence of hosts of adjudicated 'real harm' facts in many typical cases." U.S.S.G., Ch. 1, Part A, § 4(a). The *Missick* court explained that the Sentencing Commission

> sought to devise a "charge offense" system, where defendants are sentenced on the basis of conduct charged and convicted, rather than a "real offense" system where the defendant may be sentenced on the actual conduct independently of whether the conduct constituted elements of the charged offense. Sentencing Guidelines, Chap. One, Part A, § 4(a), at 1.5 (1987). However, the Guidelines retain some real offense attributes, including the specific offense characteristics which allow the district court to reduce or elevate the offense level based on individual characteristics of the defendant, such as possession of a dangerous weapon.

> Here, the specific offense characteristic of possession of a firearm by Missick was not present to justify elevating the offense level ... and Missick was not charged as a co-conspirator with the individuals who were charged with possession of firearms. Therefore, sentencing the defendant for firearm possession is clearly inconsistent with the Sentencing Commission's intent to impose sentence based on the charged offense only.

875 F.2d at 1302. Similarly, sentencing Konja for firearm possession is inconsist-

1516

ent with the Sentencing Commission's intent to impose a sentence based on the charged offense. Like Missick, Konja did not possess a firearm nor was he charged as a co-conspirator with the individuals who possessed the firearms.

In light of the Sentencing Commission's intent that sentences be based on charged conduct, I do not believe that the language of *Otero*, that "the possessor [of the firearm] *must be charged* as a co-conspirator," should be dismissed as mere dicta. *Otero*, 890 F.2d at 367 (emphasis added). Therefore, I respectfully DISSENT.