**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David P. JOHNSON and Ainsley
Richards, Defendants–
Appellants.**

**Nos. 91–3211, 92–1368.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1992.

Decided June 16, 1993.

Andrew B. Baker, Jr., Dyer, IN (argued), for U.S.

Donald W. Pagos, Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos, Michigan City, IN (argued), for David P. Johnson.

Noah Lipman, New York City (argued), for Ainsley Richards.

Before POSNER and COFFEY, Circuit Judges, and SHADUR, Senior District Judge.*

COFFEY, Circuit Judge.

David P. Johnson pled guilty to a charge of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846, and the district court, departing downward from the Sentencing Guidelines, sentenced him to thirty-three months of confinement to be followed by a five-year period of supervised release. Ainsley Richards[1] also pled guilty to a charge of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846, and was sentenced to 210 months of confinement with five years of supervised release to follow, 784 F.Supp. 1373. We affirm.

I. BACKGROUND

In September 1990, a Grand Jury returned a forty-three count criminal indictment against twelve members of the Rector family drug distribution ring. Two of these twelve members are the defendant-appellants, David Johnson and Ainsley Richards. Johnson was determined to be a minor/minimal participant in the conspiracy, assisting in the marijuana harvest as a "picker" for two weeks in Indiana and receiving a money order in payment for drugs, while the court found Richards was a leader/organizer who purchased

---

* The Honorable Milton I. Shadur, Senior Judge for the Northern District of Illinois, is sitting by designation.

1. Throughout the trial court proceedings Ainsley Richards was referred to as "Junior Richards." In order to avoid confusion we will refer to him as "Richards."

large volumes of marijuana from the Rectors and resold it in New York.

## A. The Conspiracy

Doug Rector was a drug dealer from Northern Indiana who dealt in the sale of a low grade marijuana called "ditch weed," used primarily as a filler for a higher quality marijuana. During the 1980s when this drug conspiracy was in full operation, Doug operated the enterprise out of his home in Florida, while his brother, Ron Rector, oversaw the harvesting and shipping of the marijuana from Indiana and Nebraska to New York. In 1986, Doug Rector met Edgardo "Chickie" Velez who was an acquaintance of Richards. Velez suggested to Doug that he front him some marijuana and when Doug agreed, Velez transported the marijuana from Florida to New York, where he sold it to Richards. Thereafter, Velez arranged for a substantial number of shipments of marijuana to be transported by the Rector organization to Richards in New York. The shipments initially went from Indiana through Florida to New York, but during the summer of 1986 Doug Rector changed the route and began to channel the shipments directly to New York from Indiana. In September 1986, immediately after Velez had sold 730 pounds of marijuana to Richards, Drug Enforcement Agency (DEA) agents seized $147,000 from Velez in New York. Shortly thereafter, Doug Rector became aware of the seizure, and terminated the employment of Velez as a middle-man and commenced dealing directly with Richards, using a number of couriers to accomplish the delivery of the marijuana to Richards.

By May of 1988, many members of the Rector family had either been indicted or incarcerated. Thus out of necessity, Rex Froedge, a friend and former employee of the Rectors, took over the marijuana deliveries to Richards. In August 1988, another Rector brother, Mike Rector, escaped from a state prison in Indiana and joined Rex Froedge in the drug conspiracy. Mike Rector and Froedge recruited a number of people to pick marijuana in Indiana, including the defendant-appellant David Johnson.[2] Johnson picked marijuana for Mike Rector and Froedge on several occasions over a two-week period in the fall of 1988 and was paid for his services.[3] During Johnson's two-week involvement with the conspiracy, they harvested and transported three to four thousand pounds of marijuana. In addition, Johnson received a money order in Indiana sent from New York to pay for marijuana and delivered it to Rex Froedge. After the Grand Jury returned the indictment naming Johnson as a conspirator, a warrant for his arrest was obtained and executed. Shortly thereafter, he decided to cooperate with the government and rendered substantial assistance supplying information about others involved in the conspiracy as well as agreeing to testify in any trials. Pursuant to his arrangement with the DEA, Johnson made inquiries in Indiana and was able to ascertain the location of Rex Froedge, whose whereabouts were unknown to the government. Johnson informed the government of a specific time and place in California where the authorities might find Froedge and shortly thereafter, he too was apprehended by DEA agents.

In December 1988, Mike Rector was arrested on the Indiana State Turnpike and he likewise agreed to cooperate with the DEA and the Indiana State Police. At the time of his arrest, Mike Rector was transporting five pounds of high-grade marijuana and a half-pound of cocaine he had received from Ainsley Richards. After his arrest, DEA agents had Mike Rector place a telephone call to Richards which the DEA recorded. In the taped phone conversation, Rector requested that Richards send a money order to cover the purchase of 730 pounds of marijuana. In response, Richards sent a $5,000 money or-

---

**2.** For further discussion on the Rector organization, see *United States v. Crawford*, 991 F.2d 1328 (7th Cir.1993); *United States v. Tolson*, 988 F.2d 1494 (7th Cir.1993); *United States v. Paiz*, 905 F.2d 1014, 1017–18 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991); *United States v. Tolson*, 760 F.Supp. 1332 (N.D.Ind.1991); *United States v. Tolson*, 760 F.Supp. 1322 (N.D.Ind.1991).

**3.** The record establishes that pickers were paid $1,000 per night for their services, however, it does not reflect what amount Johnson received.

der as a down payment to an alias of Mike Rector. Thereafter, Richards was arrested in New York on January 29, 1991.

## B. *The District Court Sentencing Proceedings*

After pleading guilty to a conspiracy to distribute marijuana, Johnson was sentenced on September 13, 1991. The court found Johnson's offense level to be thirty-two based on the 3,000 to 4,000 pounds of marijuana harvested by the conspiracy in the late summer and fall of 1988 while Johnson was a member of the conspiracy. The court granted Johnson a two-level reduction based on his acceptance of responsibility but refused to grant his request for a four-level reduction as a minimal participant, and instead gave him a three-level reduction, classifying him as between a minimal participant and a minor participant. This resulted in an adjusted offense level of twenty-seven. With Johnson's criminal history category of II, his Guideline range was 78–97 months. Pursuant to government motions, the court further departed downward eight levels to reflect Johnson's assistance to the government. Johnson's final adjusted offense level was nineteen with a sentencing range of 33 to 41 months. The court imposed a sentence of 33 months in prison with 5 years of supervised release to follow with a condition that he also perform 300 hours of community service.

Prior to his sentencing, Richards conceded his responsibility for the base offense level of thirty-two, which involves a range from 1,000 to 3,000 kilograms of marijuana. Richards objected to three specific findings made in the Probation Department's presentence report. The presentence report recommended a base offense level of thirty-four (3,000 to 10,000 kilograms); Richards objected to any offense level above thirty-two. Second, Richards objected to the recommendation in the presentence report of a two-level enhancement for possession of a firearm. Finally, Richards objected to the recommendation in the report of a four-level enhancement because of his role in the offense. The sentencing judge held an evidentiary hearing in order that he might rule upon Richards' objections to the presentence report. During this hearing, the government established its case through the testimony of DEA agent Trifon K. Magrames. His testimony was drawn from a number of informants as well as other sources of information such as testimony before the grand jury, trial testimony (in cases of other co-conspirators), hotel records, telephone records, Western Union records, police records and transcripts of recorded conversations. After hearing the testimony, the court determined that the evidence presented through Agent Magrames was sufficiently reliable to support the recommendations in the presentence report.

In addressing the total weight of marijuana attributable to Richards, the court, after considering Agent Magrames' testimony, found that the government had established the amount to be at least 7,865 pounds. Because this amount exceeded the highest weight assigned to the level thirty-two Sentencing Guideline, the court set Richards' base offense level at thirty-four. Further, the court found that the evidence was sufficient to infer that Richards knew of individuals under his control, who, while in his presence, were in possession of firearms during his marijuana dealings in New York. Based upon this information, the court enhanced Richards' offense level by two levels for possession of a firearm. The court also found that Richards merited a three-level enhancement because he was the manager or supervisor of criminal activity involving five or more participants.

After finding that Richards was entitled to a two-level reduction for the acceptance of personal responsibility, the court determined that his final adjusted offense level was thirty-seven. Because he had no prior criminal convictions, Richards' criminal history category was I. The sentencing range for a level thirty-seven offense with a category I criminal history is 210 to 262 months. The government recommended that the court impose the minimum sentence in the applicable Guideline range. The court accepted the recommendation and sentenced Richards to a period of confinement of 210 months, to be followed with a five-year supervised period of release.

## II. ISSUES ON APPEAL

On appeal, David Johnson raises the following issues: (1) whether the degree of the district court's downward departure was reasonable in light of the substantial assistance he provided the government, and (2) whether the district court erred in decreasing his base offense level by only three levels (as opposed to four) due to his minimal role in the criminal activity.

Richards raises the following issues in his appeal: (1) whether the district court violated his rights under the Due Process Clause by allowing the use of hearsay evidence at the sentencing hearing, (2) whether the district court properly enhanced his offense level by two levels based upon firearms possessed by a person associated with Richards, (3) whether the district court properly enhanced his offense level by two levels based upon the evidence of the amount of marijuana attributable to him, and (4) whether the court properly classified Richards as a manager or supervisor of the criminal activity leading to a three-level enhancement of Richards' sentence.

## III.

### A. *Johnson's Downward Departure*

David Johnson reasons that the limited size of the district court's downward departure, based upon his substantial assistance to the authorities, was unreasonable. *See* U.S.S.G. § 5K1.1 (delineating five factors to consider in granting a downward departure). Johnson emphasizes his truthfulness in dealing with the authorities as well as his invaluable assistance in apprehending one of the co-conspirators (Rex Froedge). It is well settled in this circuit that "appellate courts lack jurisdiction to review a defendant's challenge to the extent of a downward departure from an otherwise appropriate sentence." *United States v. Heilprin,* 910 F.2d 471, 475 (7th Cir.1990) (citing *United States v. Gant,* 902 F.2d 570 (7th Cir.1990)). Thus, regardless of how beneficial Johnson believes his assistance was to the government, an appellate court lacks jurisdiction to review a defendant's appeal challenging the exercise of judicial discretion concerning a downward departure unless the sentence imposed violates the law or resulted from a misunderstanding of the law. *See United States v. Poff,* 926 F.2d 588, 590 (7th Cir.) (appellate courts "have no jurisdiction to review a refusal to depart from the Guidelines ... when the refusal reflects an exercise of the judge's discretion"), *cert. denied,* —— U.S. ——, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991); *United States v. Dean,* 908 F.2d 215, 218 (7th Cir. 1990) ("where the defendant fails to suggest any law that the district court violated in departing downward, his appeal will be denied"); *United States v. Gant,* 902 F.2d 570, 573 (7th Cir.1990) ("section 3742(a) does not provide for appellate review of a downward departure of an otherwise appropriate sentence"); *United States v. Franz,* 886 F.2d 973, 978 (7th Cir.1989) ("Congress did not intend for departure-related decisions, including refusals to depart, to be appealable under section 3742(a)(2)").

This court does have jurisdiction to review a departure from the Guidelines if the district court imposed a sentence in violation of law or "if it is the product of a conclusion that the judge lacks authority to depart." *Poff,* 926 F.2d at 591. Based on the language in *Poff,* the defendant Johnson argues that the court should have granted a ten-level downward departure rather than an eight-level departure under § 5K1.1 of the Sentencing Guidelines and that the court's error was not one of discretion but the result of an incorrect application of the law. He maintains that the court adopted an overly conservative interpretation of *United States v. Thomas,* 930 F.2d 526, 530–31 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991). *Thomas* addressed the role of the sentencing court in granting downward departures and concluded:

> "[W]eighing the impact of any given factor on the quality of the defendant's cooperation is an imprecise art, at best. We do not intend to preclude the district court from utilizing a scale with more gradations in order to assign greater or lesser weight to the factors it considers."

*Id.* at 531. *Thomas* also instructed the district court that the government's presentence recommendation (which must be accorded

"substantial weight") should be the starting point for evaluating the departure from the Guidelines. *Id.*

In Johnson's proceeding, the sentencing judge stated that the government's recommendation (for a ten-level downward departure) was entitled to great weight. The judge declined to grant the full ten-level downward departure because he disagreed with the presentence report's recommendation concerning the defendant's truthfulness and the risk of danger presented by his cooperation. On those two factors the judge allowed but a one-level reduction rather than a two-level reduction. When dealing with the question of truthfulness, the judge stated, "the court does not believe that the truthfulness of the information alone—truthfulness on which his plea agreement was hinged—warrants a further two-level reduction in offense level." Additionally, concerning the risk of danger to Johnson from his cooperation, the judge only gave a one-level departure because of "the absence of any direct threat to Mr. Johnson...."

The defendant has failed to point out to us anything in the sentencing court's decision that would cause us to question the court's application of the law. *Thomas* expressly permits the sentencing court in the exercise of discretion to "assign greater or lesser weight to the factors it considers." 930 F.2d at 531. We affirm the eight-level downward departure and hold that the sentencing court correctly applied *Thomas* to the facts before us.

### B. *Johnson's Role in the Offense*

■■■ Johnson argues that the court erred in only granting him a three-level reduction as a minor participant under § 3B1.2 rather than a four-level reduction as a minimal participant under § 3B1.2(a). We review the district court's determination under a clear error standard. *United States v. Navarez,* 954 F.2d 1375, 1382 (7th Cir.1992).

Application Note 2 to § 3B1.2 explains: "It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marijuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs."

The mere fact that another member in the conspiracy played a more significant role (i.e. leading, organizing or managing) does not, of itself, entitle Johnson to a reduction as a minimal participant. *See United States v. Osborne,* 931 F.2d 1139, 1158 (7th Cir.1991); *United States v. Rexford,* 903 F.2d 1280, 1282 (9th Cir.1990). Clearly, Johnson's role in the conspiracy was far more involved than simply offloading a single shipment or acting as a courier for a small amount of drugs. The defendant was a trusted and an active member of the conspiracy who not only assisted in harvesting large quantities of marijuana (3000–4000 lbs.) but was also allowed to receive and deliver a substantial money order in payment for a drug shipment. Thus, the court's determination that Johnson's conduct was between that of a minimal participant and a minor participant was not clearly erroneous.

### IV.

### A. *Richards' Due Process Challenge*

■■■ Richards maintains that the exclusive use of hearsay testimony at his sentencing hearing denied him of Due Process because he did not have an opportunity to rebut the evidence. Richards relies on *United States v. Barnes,* 907 F.2d 693, 695 (7th Cir.1990), which held that if the sentencing court relies on unreliable information, the sentence will be vacated. *Accord United States v. Musa,* 946 F.2d 1297, 1306 (7th Cir.1991); *United States v. Guerrero,* 894 F.2d 261, 266 (7th Cir.1990). The defendant contends that he was unable to examine the witnesses ("Chickie" Velez, Leslie Allen, April Johnson, Tammy Porter or Mike Rector whose testimony was recounted by Agent Magrames) and the sentencing court likewise was unable to view them directly and assess their veracity.[4]

4. The sentencing court neither barred nor limited the number of witnesses the defendant Rich-

Congress has expressly permitted the use of hearsay in sentencing proceedings, Fed. R.Evid. 1101(d)(3), to prevent the sentencing hearing from becoming a full-blown trial with " 'an endless parade of witnesses.' " *United States v. Agyemang,* 876 F.2d 1264, 1271 (7th Cir.1989) (quoting *United States v. Harris,* 558 F.2d 366, 377 (7th Cir.1977) (dissenting opinion)). This court has likewise authorized a sentencing judge "to consider a wide variety of information that would be inadmissible at trial, including hearsay." *Beal,* 960 F.2d at 634. "The district court is empowered to consider this broad range of information so that it may impose the sentence most appropriate to the defendant's circumstances." *Id.* In *United States v. Campbell,* 985 F.2d 341, 348 (7th Cir.1993), we held that a defendant "has a due process right to be sentenced on the basis of reliable information ... [thus] a defendant [must] have a reasonable opportunity· to rebut contested hearsay and that contested hearsay [must] be reliable." *Id.* Only if a defendant "show[s] that the information before the court was inaccurate, and that the court relied on it" can the defendant successfully challenge his sentence. *Musa,* 946 F.2d at 1306. Furthermore, "[w]e give great deference to the district court's determination that the hearsay is worthy of credence, and will review that ruling only for an abuse of discretion." *Campbell,* 985 F.2d at 348.

The district court found that the hearsay evidence presented at sentencing through the testimony of Agent Magrames was reliable because it was corroborated by sworn testimony recorded from earlier criminal trials of Richards' other co-conspirators and from related grand jury proceedings. The court found that additional circumstantial evidence consisting of police arrest records of other participants in the criminal enterprise, hotel records, telephone records, and Western Union records further corroborated the hearsay testimony. Moreover, the record also reveals that the defendant Richards was well aware that hearsay evidence would be used against him at the sentencing hearing and that he was afforded a reasonable opportunity to cross-examine the DEA agent or present witnesses on his own behalf. In fact, the government made available to him well in advance of the sentencing hearing all the corroborating evidence it presented at sentencing thus allowing his defense counsel ample time to adequately prepare for a vigorous and thorough cross-examination.

Accordingly, we affirm the sentencing court's finding that the hearsay was reliable because it was corroborated with independent records and transcripts from prior recorded proceedings. Furthermore, because the defendant had ample opportunity to cross-examine Agent Magrames and he had ample opportunity to summon witnesses on his own behalf, his Due Process right was not violated by the use of hearsay testimony at his sentencing hearing.

### ·B.  *Richards' Base Offense Level*

▮ Richards contends that the district court erred in assessing him a base offense level of thirty-four (3,000 to 10,000 kilograms of marijuana) and that he should only have an offense level of thirty-two (1,000 to 3,000 kilograms). "Under the guidelines, the base offense level for drug offenses is determined by the type and quantity of drug involved in the offense. *See* U.S.S.G. § 2D1.1(a)(3), (c)." *United States v. Jewel,* 947 F.2d 224, 233 (7th

---

ards could call, yet even though he had the full power of subpoena, he made no attempt to call any of the three witnesses at the sentencing hearing. We think his failure to subpoena the witnesses in part undermines his argument that neither he nor the sentencing court had an opportunity to examine the witnesses. In order for hearsay to be admissible at sentencing, two requirements must be met: (1) the hearsay must be reliable, and (2) the defendant must have a reasonable opportunity to rebut the contested hearsay. *United States v. Beal,* 960 F.2d 629, 634 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992); *United States v.*

*Rodriguez–Luna,* 937 F.2d 1208, 1212 n. 4 (7th Cir.1991). The defendant's failure to call the witnesses at the sentencing hearing is but one factor we weigh in determining whether he had a reasonable opportunity to rebut the hearsay (additional factors are stated below in this opinion). In addition to permitting the defendant the opportunity to rebut the hearsay, the court must be convinced that the hearsay is reliable. *Id.* We examine the record to ascertain whether the defendant had an opportunity to rebut the hearsay and whether the district court's determination that the hearsay was reliable rose to the level of an abuse of discretion.

Cir.1991). We review the court's findings as to the facts under a clearly erroneous standard. *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir.1991).

■ The Sentencing Guidelines permit the sentencing court to approximate the amount of drugs if they are unseized.

"Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved."

U.S.S.G. § 2D1.4, comment. (n. 2). The government must establish the quantity of unseized drugs by a preponderance of the evidence. *Schuster*, 948 F.2d at 315. The district court heard considerable testimony from the DEA case agent Trifon Magrames (and also reviewed transcripts of testimony from the grand jury and trial court), concerning the quantity of marijuana delivered to the defendant. We extend great deference to the sentencing judge's credibility and fact determinations. *Id.*

On appeal, Richards contests the quantity of marijuana allegedly delivered to him by Chickie Velez in 1986 but does not challenge the remaining quantity (5,115 pounds) attributed to his participation in the conspiracy. Richards maintains that Velez's testimony concerning the 2,750 pounds of marijuana he allegedly delivered was uncorroborated, thus the 2,750 pounds should not be attributed to Richards' involvement in the conspiracy. Velez did not testify at the sentencing hearing, but Agent Magrames recounted facts concerning Velez's delivery of marijuana to Richards in 1986 based on Magrames' personal investigation, Velez's testimony before a grand jury, and Velez's testimony in the trial of other co-conspirators.

Velez testified (and was subject to cross-examination) in a district court proceeding against other co-conspirators during which time he detailed at least ten deliveries of marijuana (usually between 150 and 250 pounds) from Doug Rector to Richards. Richards stresses that the sentencing court never had the opportunity to view Velez as a witness and relied only on the testimony of Agent Magrames and testimony transcripts. Furthermore, Richards argues that during the time period in question, Velez (1) admitted to having used $50,000 in cocaine (making his testimony unreliable), (2) lied to DEA agents, and (3) received leniency from the prosecutor for his testimony. Notwithstanding these strikes against Velez's credibility, his testimony is corroborated by two sources: (1) Leslie Allen testified that Velez was initially responsible for selling the ditch weed to Richards and (2) the DEA seizure reports and the trial testimony of Merle Hopkins (another cooperating witness) confirm that Velez delivered 730 pounds of marijuana in September 1986 but the proceeds of this delivery were seized during Velez's return to Florida. The defendant is attacking the credibility determination of the sentencing court as well as its factual finding regarding the quantity of marijuana attributable to Richards. The statute and case law require that we treat the district court's findings with great deference:

"The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts."

18 U.S.C. § 3742(e). We extend "great deference to the district court's determination that the hearsay is worthy of credence, and will review that ruling only for an abuse of discretion." *Campbell*, 985 F.2d at 348. Based on Chickie Velez's testimony before the grand jury and in the criminal trial of a separate defendant, along with the corroborating testimony of Leslie Allen and the seizure of the $147,000, we are of the opinion that the sentencing court's calculation of the quantity of marijuana Velez transported to Richards was accurate. Thus, we hold that the government has established by a preponderance of the evidence that Richards was

responsible for the contested 2,750 pounds of marijuana.

### C. *Richards' Firearm Enhancement*

█ The Sentencing Guidelines authorize a two-level enhancement for the possession of a firearm during the course of the conspiracy. *See* U.S.S.G. § 2D1.1(b)(1). Section 2D1.1(b)(1) does not require the *defendant* to possess the firearm, rather it only states "If a dangerous weapon (including a firearm) *was possessed*, increase by 2 levels." *United States v. Rodriguez–Nuez*, 919 F.2d 461, 466 (7th Cir.1990) (quoting § 2D1.1(b)(1)) (emphasis added). Application Note 3 adds "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied *if the weapon was present*, unless it is clearly improbable that the weapon was connected with the offense...." § 2D1.1(b)(1), comment. (n. 3) (emphasis added).[5] We review the sentencing court's factual findings relating to the weapons enhancement for clear error only. *United States v. Ewing*, 979 F.2d 1234, 1238 (7th Cir.1992).

The sentencing court, relying on the testimony of Agent Magrames, found that April Johnson, Tammy Porter and Mike Rector (three cooperating government witnesses) had seen weapons present at the unloading of marijuana in New York supervised by Richards. Agent Magrames recounted April Johnson's testimony as follows:

Q. "Is there any reference to her observing any guns when she would go out to New York?"

A. "Yes."

Q. "And advise the court what you recall her saying."

A. "I recall her indicating that she saw weapons, big guns, she indicated machine guns, is what I wrote down. August through September, 1988. At least six bodyguards. [Rex Froedge] as of [April 1990] with Junior [Richards]...."

Q. "So, is it your best recollection that in your debriefings of April Johnson that

she did in fact mention weapons being involved with drug transactions—"

A. "Yes."

Q. "—with Rex Froedge?"

A. "Yes."

Q. "And his drug transactions with Junior Richards?"

A. "Yes."

*Sentencing Transcript* at 187. Concerning the testimony of Tammy Porter, Agent Magrames stated:

A. "She said there were other individuals and there were some females there and that one individual specifically had a weapon, a gun."

Q. "And that was in relation to this particular trip to sell marijuana. Is that correct?"

A. "Yes. She further indicated it was in his hand on one occasion, the weapon was."

*Sentencing Transcript* at 185. Finally, Magrames related the testimony of Mike Rector:

Q. "Now, with respect to the testimony of Mike Rector before the grand jury, you also testified about observing weapons during various drug transactions. Is that correct?"

[Magrames reads from transcript.]

A. "Yes, sir. 'Yes sir. He had a whole city block there working for him before the raid at his house, probably ten, twelve, fifteen, maybe twenty people there at all times in his house.'

"Question: 'I mean, in other words, was [Richards] somehow protected?'

"Answer: 'Yes, sir, Every time he knocked on door [sic] there would be five or six of them answering you with a pistol. He is pretty well guarded.' "

*Sentencing Transcript* at 191. This court has reversed a two-level weapons enhancement when "there was no proximity between the weapon and the contraband," *United States v. Edwards*, 940 F.2d 1061, 1063 (7th

---

**5.** The Supreme Court recently announced that the Sentencing Commission's commentary to the guidelines is binding on the federal courts unless it conflicts with either the U.S. Constitution or a federal statute. *Stinson v. United States*, —— U.S. ——, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

Cir.1991) (citing *Rodriguez–Nuez*, 919 F.2d at 466), but as Agent Magrames' testimony clearly establishes, the people possessing weapons were individuals under Ainsley Richards' control and in close proximity to the drug transactions.

To enhance Richards' sentence, the district court relied on *United States v. Morgan*, 942 F.2d 243, 246–47 (4th Cir.1991) ("section 2D1.1(b)(1) enhancement properly applies when a defendant has knowledge of his co-conspirator's possession of a firearm during acts furthering the conspiracy") and *United States v. Bianco*, 922 F.2d 910, 912 (1st Cir. 1991) ("the sentencing guidelines expressly require a two-level increase in a defendant's base offense level whenever a codefendant's possession of a firearm in furtherance of their joint criminal venture was reasonably foreseeable by the defendant"). Richards argues that *Bianco* and *Morgan* are clearly distinguishable because, in both *Bianco* and *Morgan*, a co-conspirator did possess a weapon whereas in this case the testimony fails to place a weapon in the hands of a co-conspirator. The district court rejected this argument stating, "Given the surrounding circumstances—armed people greeting those who arrived with drugs—the court finds that the weapons were connected with the offense and that Mr. Richards was aware of the weapons' presence." Mem. Op., 784 F.Supp. at 1381.

The question we must answer is whether a defendant's sentence may be enhanced for possession of a firearm when an unindicted co-conspirator possesses a weapon but the evidence fails to establish that the weapon was possessed by the defendant or by an indicted co-conspirator. In contrast, *Bianco* and *Morgan* involved situations where a co-conspirator or co-defendant possessed a weapon at some time during the course of conspiracy. Likewise, this case is distinguishable from *Rodriguez–Nuez*, 919 F.2d at 466–67, where the weapon was found at a different location than the sale of the drugs. In the case before us, the testimony of three individuals reveals that the weapons were present during the unloading of marijuana in New York.

We are of the opinion that *United States v. Nino*, 967 F.2d 1508, 1514 (11th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1432, 122 L.Ed.2d 799 (1993), is relevant to the case before us. In *Nino*, one conspirator died before the conspiracy ended and a second conspirator cooperated with the government and was never charged. The third conspirator, Nino, was charged with the conspiracy and his sentence was enhanced for a weapon possessed by one of the uncharged co-conspirators. The court concluded that "the rules of co-conspirator liability as explained in *Pinkerton* [*v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)] and the Sentencing Guidelines do not require that the firearm possessor be a *charged* co-conspirator when that co-conspirator dies or is otherwise unavailable for indictment." *Id.* at 1514. In the same opinion, when distinguishing a prior case, the court stated "the [*United States v. Otero*, 890 F.2d 366, 367 (11th Cir.1989)] reasoning avoids artificial sentence enhancement for firearm possession when the weapon is actually or constructively possessed by a person outside the conspiracy (for example, an undercover agent, confidential informant, or other non-conspirator)." *Id.* at 1514.

■ *Nino* makes clear that the one possessing the weapon need not be an indicted co-conspirator. We think this is especially true when the weapon was in the possession of someone under the defendant's control and in close proximity to the defendant and the drugs. *See Rodriguez–Nuez*, 919 F.2d at 466 ("[p]hysical proximity of the weapon and contraband is usually enough to support an enhancement").

The plain language of Application Note 3 states that the weapon need only *be present* and says nothing about the defendant or a co-conspirator possessing that weapon. *See* U.S.S.G. § 2D1.1(b)(1), comment. (n. 3). The evidence before the district court makes it clear that persons under Richards' control possessed weapons in close proximity to Richards at the time of unloading the marijuana. Even though those persons' exact identity remains unknown and they remain unindicted, the record is clear that the weapons were present during the drug transactions in question, possessed by associates of Richards, and known to Richards. This

court has been unable to locate, nor has the defendant directed us to any case law requiring that the weapons be possessed by indicted co-conspirators when the weapons were in such close proximity to the defendant and so obviously possessed by his bodyguards who were ready, willing and able to act if needed. The weapons were possessed in the course of the conspiracy and Richards had full knowledge of their presence at the unloading of the marijuana. We hold, therefore, that the two-level enhancement of Richards' sentence was proper.

### D. *Richard's Role in the Offense*

■ Richards argues that the court committed clear error in finding that his role in the conspiracy warranted a three-level enhancement. The government in the presentence report recommended a four-level enhancement because Richards was an organizer/leader of five or more people. Richards maintains that he was merely a middleman who bought marijuana from the Rector organization. The sentencing court found that Richards was a "manager or supervisor (but not an organizer or leader) of criminal activity that involved five or more participants." Mem. op., 784 F.Supp. at 1384 (citing U.S.S.G. § 3B1.1(b)). The court held, "The guideline only requires that the criminal activity involve five or more participants and that the defendant play a managerial or supervisory role. This conspiracy and Mr. Richards satisfied both requirements." *Id.* at 1385.

There is no question that the conspiracy involved five or more persons, the indictment itself names twelve defendants and does not include those conspirators who were previously convicted (Ron Rector, Mike Rector and Chickie Velez). The testimony of Agent Magrames at the sentencing hearing clearly established that Richards supervised Eric Clark, Ali, and Berris (last names unknown) in the unloading of marijuana shipments from Florida and Indiana. Richards' supervisory role demonstrates that he was more than a mere middleman. *United States v. Lawson*, 947 F.2d 849, 852 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1505, 117 L.Ed.2d 643 (1992) (exercising authority

and handling large sums of money are evidence that one is more than a "mere 'intermediary' "). Furthermore, we are of the opinion that *United States v. McGuire*, 957 F.2d 310, 316–17 (7th Cir.1992), is controlling based on the facts before us.

"[T]here is no requirement in § 3B1.1(b) that a defendant control the activities of all the participants in the criminal activity.

"[The defendant] controlled the activities of at least three people in the criminal activity, and was, therefore, a 'manager' within the meaning of § 3B1.1(b). Further, the criminal activity involved seven participants. Thus, the requirements of § 3B1.1(b) are met in this case by the showing that [the defendant] was a 'manager' and the criminal activity involved 'five or more participants.' The district court correctly increased [the defendant's] offense level by three."

*Id.* (footnote omitted).

Richards argues that *United States v. Brown*, 944 F.2d 1377 (7th Cir.1991), and *United States v. Thompson*, 944 F.2d 1331 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992), require that this court reverse the three-level enhancement for Richards' role as a manager or supervisor in the conspiracy. In *Brown*, this court held that because the defendant did not exercise any control over his ultimate purchasers, he could not be regarded as their supervisor. 944 F.2d at 1381. In *Thompson*, the court held that "[o]ne's status as a middleman in a drug distribution chain does not, standing alone, make one a manager or supervisor." 944 F.2d at 1349. Even though Richards controlled neither the delivery of the marijuana shipments from Indiana, nor the couriers, Agent Magrames' testimony reveals that Richards did supervise the unloading of the marijuana in New York. In his leadership role, Richards clearly exercised control and supervision over at least three individuals (Clark, Ali and Berris). We therefore affirm the district court's holding that the conspiracy involved five or more persons, and that Richards had a managerial or supervisory role.

*CONCLUSION*

We AFFIRM the sentences of David Johnson and Ainsley Richards.