UNITED STATES of America, Plaintiff,

v.

Leonardo ALEMAN, Defendant.

No. CR–92–299–04–WS.

United States District Court,
M.D. North Carolina,
Winston–Salem Division.

Feb. 23, 1994.

**118**

Paul A. Weinman, Asst. U.S. Atty., Greensboro, NC, for plaintiff.

Carol L. Teeter, Stuart L. Teeter, Winston–Salem, NC, Stephen H. Rosen, Coral Gables, FL, for defendant.

### MEMORANDUM OPINION

BULLOCK, Chief Judge.

This case comes before the court on Defendant's motion to dismiss Count One of the indictment filed against him on December 1, 1992, in the Middle District of North Carolina. Defendant claims the indictment charges him with the same conspiracy to which he pled guilty in Tampa, Florida, in 1986, and therefore the North Carolina indictment should be barred by the Fifth Amendment's double jeopardy clause. Having found Defendant's claim non-frivolous, the court conducted a pre-trial evidentiary hearing at which the Government presented evidence and Defendant testified.

### FACTS

#### A. *The Tampa Agreements*

##### 1. The Gutierrez Agreements to Broker Marijuana Sales

Pedro Gutierrez brokered marijuana sales in Tampa, Florida. By September 17, 1986, he had reached agreements with two separate buyers to broker purchases for them. He had agreed to broker a sale for Defendant, and he had agreed to broker another sale for David Milton Crews, Luis Oropesa, and Daniel Lopez. When Gutierrez reached these agreements, Defendant and Crews were not acquainted and not doing business together. When Gutierrez negotiated the terms of the sales with the prospective suppliers, neither he, nor Defendant, nor Crews knew that the suppliers were undercover law enforcement officers.

On September 17, 1986, Defendant drove to Tampa from his home in Mulberry, Florida, to meet Gutierrez and obtain the marijuana. Through Gutierrez, an officer-supplier arranged an initial meeting with both Defendant and the other buyers in a parking lot. At the parking lot, the officer was introduced to Defendant, who was in one car, and Oropesa and Lopez, who were in another. Crews was not present. Defendant said he wanted 100 pounds of marijuana. When asked for assurances that he had purchase money in hand, Defendant produced a box containing several thousand dollars. Oropesa and Lopez wanted 200 pounds of marijuana. When asked for assurances that they had purchase money in hand, they said they had left it in a nearby hotel and offered to take the officer to see it. The officer declined but was satisfied the two groups of buyers were prepared to deal. The officer told the buyers to wait with Gutierrez until further notice.

Later in the day, after an officer notified them to proceed, the buyers drove to a warehouse to pick up the marijuana. Defendant drove alone in one car, Oropesa and Crews drove in another, and Gutierrez and Lopez drove in a third. Defendant and Oropesa each backed his car into the warehouse, near a van loaded with bales of marijuana.

Two officers took a bale out of the van and cut it open so the buyers could judge the quality of the marijuana. Defendant said he wanted to buy 100 pounds. He and an officer went into the office, and his money was counted out. He paid $35,400.00 for 101 pounds of marijuana.

Back in the warehouse, Oropesa told an officer that Crews was not satisfied with the quality of the marijuana. Crews dickered with the officer about reducing the price. Before Crews and the officer reached an agreement, a team of officers entered the warehouse and arrested Defendant, Gutierrez, Crews, Oropesa, and Lopez.

## 2. The Aleman–Crews Agreement

According to Defendant's hearing testimony, upon his arrival in Tampa, he and Gutierrez went to a motel, where Gutierrez introduced him to Crews, Oropesa, and Lopez for the first time. The five men discussed the upcoming meeting with the sellers who wanted to inspect the buyers' money before proceeding with the sales. Defendant and Crews were both afraid of rip-offs. Defendant agreed that only his money would be taken to the inspection site, so long as Crews would agree to indemnify him for at least part of the loss if he were to be robbed.

According to Defendant, Crews was also concerned that Crews's 200 pound purchase would not fit in the trunk of Crews's car. The two agreed that if it did not fit Defendant would put some of it in the trunk of his own car and drive it up to North Carolina behind Crews.

Defendant also testified that he initially expected to sell his marijuana in Florida. When he heard how much profit Crews made selling marijuana in North Carolina, however, he asked "Is there any problem with me taking mine up there, and I'll split the profit with you?" Crews replied, "No problem." Tr. Nov. 2, 1993, Hr'g at 68 (filed Nov. 16, 1993).

## 3. The Tampa Indictment

After their arrests in the warehouse, Defendant, Gutierrez, Crews, Oropesa, and Lopez were indicted in the Middle District of Florida, Tampa Division. Count I charged them with attempting to possess with intent to distribute marijuana "on or about September 17, 1986, at Tampa." Count II charged them with conspiring to possess with intent to distribute a quantity of marijuana, in violation of 21 U.S.C. § 846, from an unknown date until September 17, 1986. The conspiracy was said to have involved the named defendants and "diverse other persons unknown to the Grand Jury" and to have occurred "in the Middle District of Florida, and elsewhere."

Both Defendant and Crews pled guilty to the Count II conspiracy charge and were sent to the same federal prison.

## B. *The North Carolina Agreement*

### 1. Aleman's Cocaine Sales to Smith

In 1988, while still in prison, Crews talked to Terry Smith, who had conspired with him since 1980 to distribute cocaine and marijuana in North Carolina. According to Smith, Crews told Smith to contact "Leonard" in Lakeland, Florida. Crews said he had met Leonard for the first time when he was in Tampa to buy marijuana, that they "just happened to get busted at the same time . . . [and] became friends during the trial." Tr. at 34–35. Crews told Smith Leonard had just gotten out of prison and could give Smith cocaine at a good price.

Smith went to Florida in the fall of 1988 and met Leonard, actually Leonardo Aleman, the defendant, for the first time. Smith had never dealt drugs with Defendant before. Smith ultimately made between twenty and twenty-five trips to Florida to buy cocaine from Defendant.

### 2. The North Carolina Indictment

In 1992, Defendant, Crews, and ten others not named in the Tampa indictment were indicted in the Middle District of North Carolina for conspiring to distribute cocaine hydrochloride and marijuana, in violation of 21 U.S.C. § 846, from 1980 through 1992. The conspiracy is said to have involved the named defendants and "divers other persons, known and unknown to the Grand Jurors" and to have occurred "in the Middle District of North Carolina and elsewhere." While the indictment lists seventeen counts, Defendant is named in only Count One, the conspiracy count.

## DISCUSSION

### A. *Legal Standard*

 The Fifth Amendment's double jeopardy clause creates "the right to be immune from multiple prosecutions for the same offense." *United States v. Ragins,* 840 F.2d 1184, 1192 (4th Cir.1988). The essential and defining characteristic of the crime of conspiracy is the agreement. *United States v. Broce,* 488 U.S. 563, 570, 109 S.Ct. 757,

762–63, 102 L.Ed.2d 927 (1989); *United States v. Townsend,* 924 F.2d 1385, 1389 (7th Cir.1991). "A single agreement to commit several crimes constitutes one conspiracy. By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies." *Broce,* 488 U.S. at 570–71, 109 S.Ct. at 763. Determining whether the government can prosecute a defendant for multiple conspiracies requires discerning whether the defendant made "one agreement to commit two crimes, or more than one agreement, each with a separate object." *United States v. Thomas,* 759 F.2d 659, 662 (8th Cir.1985).

■ In assessing the validity of a defendant's double jeopardy claim against successive conspiracy charges, the court applies a five-factor analytical framework. The factors are: the time periods in which the conspiracies are alleged to have occurred; the places where the conspiracies are alleged to have occurred; the persons allegedly acting as co-conspirators; the substantive statutes alleged to have been violated; and the overt acts alleged to have been committed in furtherance of the conspiracies, or any other descriptions of the conspiracies charged which indicate their nature and scope. *United States v. Jarvis,* 7 F.3d 404, 411 (4th Cir.1993). The framework is applied flexibly. The court may consider other characteristics of the charged conspiracies, and the weight of each factor may vary. *United States v. McHan,* 966 F.2d 134, 138 (4th Cir.1992).

■ Once a defendant has made a sufficient preliminary showing of similarity between the two charged conspiracies, the burden shifts to the Government to prove by a preponderance of the evidence that the indictments refer to two separate criminal agreements. To discern the scope and thus the sameness or separateness of the charged conspiracies, the court may ultimately look beyond the charging instruments to the record as developed in a pre-trial evidentiary hearing. *McHan,* 966 F.2d at 138.

B. *Application of the Five Factors to Defendant's Case*

Before the court now are: the Tampa indictment; the North Carolina indictment; the testimony of Officer Cuesta, who participated in the Tampa investigation and sting; the testimony of Terry Grey Smith, a North Carolina co-conspirator; and the testimony of Defendant. The five factors, as gleaned from the record before the court, reveal the following.

1. Time Periods

The time periods during which the conspiracies were alleged to have occurred overlap. The period of 1980 to 1992 alleged in the North Carolina indictment completely embraces the period of "from an unknown date until on or about September 17, 1986" alleged in the Tampa indictment.

2. Places

The places in which the conspiracies were alleged to have occurred are different. The first indictment charged a conspiracy in the Middle District of Florida and a substantive offense "at Tampa." The second charged a conspiracy and various substantive offenses in the Middle District of North Carolina. The only other place alleged in both indictments is "elsewhere."

3. Co–Conspirators

Each indictment charged both Defendant and Crews with conspiring with each other and "diverse other persons." The Tampa indictment, however, named three conspirators not named in the North Carolina indictment, and the North Carolina indictment named ten conspirators not named in the Tampa indictment. Aside from Defendant and Crews, no other person named in either indictment has been implicated as an actor in the other conspiracy. The persons acting as co-conspirators were, therefore, not "in large measure the same for purposes of both conspiracy prosecutions." *Jarvis,* 7 F.3d at 411.

4. Substantive Statutes

Each indictment charged a violation of 21 U.S.C. § 841(a)(1). The Tampa indictment charged Defendant with a single substantive offense—attempting to possess with intent to distribute a quantity of marijuana—and a conspiracy to commit that offense. The

North Carolina indictment charges Defendant with a conspiracy to distribute cocaine hydrochloride and marijuana, but with no substantive offenses.

### 5. Overt Acts and Other Evidence of Nature and Scope

None of the substantive offenses alleged are common to both indictments. In the Tampa prosecution, the Government relied on the overt acts showing Gutierrez's agreements to broker sales of 100 pounds of marijuana to Defendant and 200 pounds of marijuana to Crews. Those acts standing alone indicate that on September 17, 1986, Defendant and Crews each conspired with the same broker to obtain marijuana but were otherwise separate buyers, in separate cars, with separate bundles of money, buying their drug bales at separate prices.

At the double jeopardy hearing, the Government offered Smith's testimony as evidence of Defendant's overt acts pursuant to the North Carolina conspiracy. That testimony shows that in 1988, but not before, Defendant supplied the North Carolina conspiracy with cocaine, which he sold from the Lakeland, Florida, area.

The Tampa agreements had a limited objective: to obtain and sell a specific quantity of marijuana. When Defendant and Crews were arrested, this limited objective was defeated. The later agreement Defendant made with Crews and Smith, however, was to supply cocaine to the North Carolina group on a regular, on-going basis.

### C. Conclusion

 The inclusion of one time period within another, the slight overlap of named co-conspirators, and the identity of statutory offenses charged are not conclusive as to the existence of only one conspiracy. *See United States v. Nino,* 967 F.2d 1508, 1511 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1432, 122 L.Ed.2d 799 (1993). The same individual may participate concurrently in more than one conspiracy to commit exactly the same kind of crime. *See Kotteakos v. United States,* 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1242–43, 90 L.Ed. 1557 (1946).

The Tampa and North Carolina indictments, based on geographically and factually independent law enforcement investigations, were each lodged against a separate conspiracy occurring in a separate place, furthered by separate overt acts committed by significantly different people. *Cf. Jarvis,* 7 F.3d 404 (two cities and one overt act common to both indictments; same six persons acting as co-conspirators in each conspiracy). The first conspiracy related to a single marijuana transaction, the second to the broad distribution of marijuana and cocaine. The difference in the drugs indicates differences in objectives sufficient to support a finding of separate conspiracies. *See, e.g., United States v. Glenn,* 828 F.2d 855 (1st Cir.1987) (evidence supports finding defendant guilty of conspiracy to import and possess hashhish, but defendant did not share core group's additional objective of importing and possessing marijuana). The North Carolina prosecution of Defendant, therefore, does not violate his Fifth Amendment rights. *See Nino,* 967 F.2d 1508.

Defendant contends that the scope of the Tampa conspiracy was greater than the Government's evidence showed. According to Defendant, he agreed, first, in return for indemnification to guard the buyers against rip-offs by new suppliers by showing only his money; second, to help transport a bale of marijuana if the amount Crews bought would not fit in Crews's car; and, third, to pay Crews for permission to sell his 100 pounds of marijuana in North Carolina. The only evidence tending to corroborate Defendant's story is Officer Cuesta's testimony that he saw only one bundle of money at the parking lot. The preponderance of the evidence, however, supports the inference that Crews and Aleman were not working together. Crews, but not Aleman, refused to have his money taken to the parking lot. Crews, but not Aleman, took the opportunity to dicker over the quality and price of the offered marijuana.

Even if Defendant and Crews did come to an agreement together in Tampa on September 17, 1986, their agreement reached no further than that day's marijuana purchases. The evidence at the double jeopardy hearing

and at the earlier trial of one of Defendant's North Carolina co-conspirators clearly established a North Carolina conspiracy dating back to 1980. The evidence also established that Defendant did not join the North Carolina conspiracy until, having become friendly with Crews during their trial and incarceration, he agreed to supply the North Carolina conspirators with cocaine.

## DISPOSITION

Because the Government has proven that the present indictment does not charge Defendant with the same conspiracy to which he pled guilty in the Middle District of Florida in 1986, Defendant's motion to dismiss Count One of the indictment will be denied.